**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

FRANKLIN SAVAGE,

KELVIN SEWELL,

and LYNELL GREEN,

      Plaintiffs,

v.

POCOMOKE CITY,

COUNTY COMMISSIONERS OF
WORCESTER COUNTY,
Worcester Government Center
1 West Market Street, Room 1103
Snow Hill, MD 21863
County of Residence: Worcester
      Serve on: Maureen Howarth
      Worcester County Government Center
      1 W. Market St. Room 1103
      Snow Hill, MD 21863

REGGIE T. MASON,
in his official capacity as Worcester County
Sheriff
1 West Market Street, Room 1001
Snow Hill, MD 21863
County of Residence: Worcester
      Serve on: Jason Levine
      Assistant Attorney General
      Maryland State Treasurer's Office
      80 Calvert Street, 4th Floor
      Annapolis, MD 21401

**FIRST AMENDED COMPLAINT FOR
DECLARATORY RELIEF,
INJUNCTIVE RELIEF, DAMAGES,
AND ATTORNEYS' FEES**

Civil Action No. 1:16-cv-00201-JFM

Jury Trial Demand

RUSSELL BLAKE,
in his individual capacity only

ERNIE CROFOOT,
individually, and in his official capacity as
Pocomoke City Manager

BRUCE MORRISON,
individually, and in his official capacity as
Pocomoke City Mayor

BEAU OGLESBY,
in his individual capacity as the
Worcester County State's Attorney

NATHANIEL PASSWATERS,
individually, and in his official capacity as a
Worcester County Sheriff's Office Sergeant

BROOKS PHILLIPS,
individually, and in his official capacity as a
Department of Maryland State Police Corporal

DALE SMACK,
individually, and in his official capacity as a
Worcester County Sheriff's Office Deputy

RODNEY WELLS,
individually, and in his official capacity as a
Worcester County Sheriff's Office Corporal

and PATRICIA DONALDSON,
individually, and in her official capacity as a
Department of Maryland State Police Sergeant

Defendants.

## **INTRODUCTION**

1.  This is one of the saddest and most shocking cases this Court is likely to address.

Three African American police officers, working for Pocomoke City, Maryland, experienced

racial discrimination in employment and retaliation for the exercise of their federal civil rights in

a manner that most Americans would have believed unthinkable in the second decade of the Twenty-First Century. While Pocomoke City bills itself as the "Friendliest Town on the Eastern Shore," its law enforcement community, including police officers and elected officials from the Pocomoke City Police Department, the Department of Maryland State Police, the Worcester County Sheriff's Office, and, most disappointingly, the Worcester County State's Attorney's Office, acted more in the vein of "Jim Crow."

2.     Three model police officers, including the first African American chief of police in Pocomoke City and the first and only African American detective assigned to the local narcotics task force, were mocked, threatened, demeaned, demoted, punished, falsely accused of misconduct, ostracized, and humiliated because of their race. Ultimately, two of the Plaintiffs here, Franklin Savage ("Officer Savage") and Kelvin Sewell ("Chief Sewell"), were fired by Pocomoke City in obvious retaliation for their filing of United States Equal Employment Opportunity Commission ("EEOC") complaints. The third officer, Lynell Green ("Lieutenant Green"), resigned from the Pocomoke City Police Department due to health concerns arising from his work environment. The intervention of this Court is vitally necessary to make clear to some members of the law enforcement community on the Eastern Shore that this blatant disregard of federal constitutional and statutory rights will not be tolerated.

3.     The use of the word "nigger" long ago ceased to be tolerated in any American workplace. So, too, did other forms of racial mockery, epithets, threats, humiliation, and discrimination based on race in the terms of employment. Yet, the three Plaintiffs in this action—Officer Savage, Chief Sewell, and Lieutenant Green—experienced unlawful conduct of this character, often on a daily basis.

4.     Officer Franklin Savage endured a hostile work environment and employment

discrimination throughout his four-year tenure with the Pocomoke City Police Department. He spent more than half of that time detailed to the Worcester County Criminal Enforcement Team ("Joint Task Force"), a regional drug-interdiction task force, led by the Worcester County Sheriff's Office. Officer Savage was the first and only African American police officer ever assigned to the Joint Task Force. For more than two years, members of the Joint Task Force, and at least one other government official, used the word "nigger"—and its variants—in Officer Savage's presence numerous times. They also subjected Officer Savage to other forms of racial harassment and discrimination, such as taking an on-duty side trip to a so-called "KKK Lane" and placing a fake food stamp in Officer Savage's desk drawer on which a picture of President Obama had been superimposed. A bloody deer's tail was placed on Officer Savage's car windshield on a side street by unknown members of the Joint Task Force.

5.      One of Officer Savage's Joint Task Force supervisors, Defendant Passwaters, participated actively in the racial discrimination against him. His other supervisor on the Joint Task Force, Defendant Donaldson, knew of the unlawful racially discriminatory acts but did nothing to stop them or discipline the offenders.

6.      When Officer Savage finally complained within the Pocomoke City Police Department about this racially-motivated mistreatment, and left the Joint Task Force, he found himself railroaded out of law enforcement in Worcester County. He was demoted without reason. His duties were restricted. He was blackballed from testifying in criminal cases—an integral part of his job—by the county's State's Attorney. In a hallmark of retaliation, the same Officer Savage who had received glowing reviews and laudatory letters of recommendation for years was suddenly described as an incompetent and untrustworthy officer. Officer Savage was then fired from the Pocomoke City Police Department without just cause and for stated reasons

that are obvious pretexts for racial hostility and retaliation.

7.      The retaliation against Officer Savage also swept up the other Plaintiffs, Chief Kelvin Sewell and Lieutenant Lynell Green.

8.      Chief Sewell served as chief of the Pocomoke City Police Department for almost all of Officer Savage's employment, and, as noted above, was the first African American police chief of Pocomoke City.  He was fired from the Pocomoke City Police Department because he refused to fire Officer Savage in the face of pressure from various Pocomoke City and Worcester County employees and elected officials.  Chief Sewell refused to fire Officer Savage both because he saw no basis for his discharge and because Chief Sewell viewed firing Officer Savage as improper retaliation for Officer Savage's protected conduct in filing EEOC complaints against the very individuals who wanted him fired.

9.      Lieutenant Green, for his part, served as a lieutenant in the Pocomoke City Police Department for over four years.  As a show of support for Officer Savage, Lieutenant Green attended a mediation hearing regarding a claim that Officer Savage filed with the EEOC. Lieutenant Green then found himself on the wrong side of the law enforcement officialdom in Worcester County.  For supporting Officer Savage, Lieutenant Green experienced repeated acts of retaliation from his fellow officers and the Pocomoke City Council.  Lieutenant Green had his pay restricted by Pocomoke City, and Pocomoke City Police Department policies that may appear facially neutral and broadly applicable but, upon scrutiny, were clearly targeted at Lieutenant Green alone.

10.     Plaintiffs are thus suing the individuals and entities responsible for this unchecked pattern and practice of virulent racial discrimination and retaliation.  They are also suing the officers, elected officials, law-enforcement agencies, and governmental entities that condoned or

failed to stop this behavior.  Finally, they are suing those that orchestrated retaliation against the Plaintiffs for seeking to remedy a racially hostile work environment and discrimination and then joined in unlawful retaliation against the three for supporting each other's protected conduct. The acts of race discrimination and retaliation were collective of named Defendants and were mixed and intertwined with each other.

11.     Plaintiffs present numerous causes of action because race-based discrimination and retaliation are both clearly prohibited by federal laws as well as the United States Constitution.  The asserted causes of action include those arising under 42 U.S.C. §§ 1981 and 1983, for violations of the First and Fourteenth Amendments; 42 U.S.C. § 1985; and the Fair Labor Standards Act.  Plaintiffs expect to add further causes of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), once those claims are administratively exhausted before the EEOC and become ripe for suit.

12.     The damages here are substantial.  Officer Savage and Chief Sewell have both been wrongfully fired.  Officer Savage has been unable to find new employment as a police officer and has suffered physical and psychological harm directly attributable to his mistreatment.  Chief Sewell is currently unemployed and seeks reinstatement to his former position as Pocomoke City's chief of police.  Both Officer Savage and Chief Sewell seek front and back pay and damages for both physical and psychological harms as well as injunctive relief. Lieutenant Green was left with resignation as his only option.  He seeks back pay for loss of overtime, as well as damages.  All Plaintiffs seek appropriate injunctive relief against all Defendants to ensure that the unlawful discrimination and retaliation does not occur in the future in Worcester County.  All Plaintiffs also seek costs and attorneys' fees under 42 U.S.C. § 1988, and such other relief as this Court deems just and proper.  All Plaintiffs demand a trial by jury.

## NATURE OF THE ACTION

13.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1985, 29 U.S.C. § 201, and the United States Constitution to remedy the unlawful discrimination and retaliation engaged in by Defendants Pocomoke City, the County Commissioners of Worcester County ("Worcester County"), Reggie T. Mason ("Mason"), Russell Blake ("Blake"), Ernie Crofoot ("Crofoot"), Bruce Morrison ("Morrison"), Beau Oglesby ("Oglesby"), Nathaniel Passwaters ("Passwaters"), Brooks Phillips ("Phillips"), Dale Smack ("Smack"), Rodney Wells ("Wells"), and Patricia Donaldson ("Donaldson").

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction over all Counts pursuant to 28 U.S.C. § 1331 because those claims arise under the United States Constitution and laws of the United States.

15.     Jurisdiction to grant a declaratory judgment is conferred by 28 U.S.C. §§ 2201-02.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all of the events, acts, and/or omissions giving rise to Plaintiffs' claims occurred in the State of Maryland.  Specifically, most of them occurred in Worcester County, Maryland.

## PARTIES

### PLAINTIFFS

17.     Officer Savage joined the Pocomoke City Police Department in April 2011.  He began representing the Pocomoke City Police Department as an officer on the Joint Task Force in or around February 2012.  Officer Savage was the first African American detailed to the Joint Task Force.  He was known as an excellent narcotics officer—particularly in undercover narcotics buys—which was why he was detailed to this important position with the Joint Task Force.

18.     In or around May 2012, Officer Savage was promoted to detective.  He resigned

from the Joint Task Force on June 12, 2014, and returned to the Pocomoke City Police Department as a detective. After reporting the harassment and retaliatory behavior of which he had been victim while on the Joint Task Force, Officer Savage was demoted from detective to officer on February 9, 2015. He was told he could not make arrests alone or testify in court. Eventually, he was demoted to patrolman, often relegated to checking doors on the night shift. Officer Savage was unlawfully terminated from his position as a patrolman in the Pocomoke City Police Department on October 26, 2015.

19.     Chief Sewell joined the Pocomoke City Police Department in November 2010, after retiring from the Baltimore City Police Department as a sergeant after twenty-two years of distinguished service. He was hired as a lieutenant and served as the Pocomoke City Police Department's operations manager. Chief Sewell was promoted to captain on October 1, 2011, and to chief of police on December 1, 2011. Chief Sewell was the first African American to hold this position in Pocomoke City. During his tenure as chief, there were no homicides in Pocomoke City. Crime, particularly drug and street crime, dropped significantly during Chief Sewell's tenure. Chief Sewell instituted community policing principles in Pocomoke City, and the relations between the police department and the citizenry, including the African American community, improved significantly. Chief Sewell was respected by his officers and by the community. He enjoyed a reputation as an excellent police chief. Chief Sewell served as chief until he was unlawfully terminated on July 1, 2015.

20.     Lieutenant Green joined the Pocomoke City Police Department on or about November 13, 2011, as an officer. He was promoted to first sergeant on December 6, 2011, and was promoted to lieutenant and operations manager on February 29, 2012. He spent ten years with the Baltimore City Police Department before joining the force in Pocomoke City. After

supporting Officer Savage in the latter's EEOC complaint, Lieutenant Green had his pay and terms of employment adversely altered in retaliation for that support. On March 1, 2016, Lieutenant Green resigned from the Pocomoke City Police Department because of life threatening health conditions caused by the hostile environment and continued retaliation he experienced.

<strong>DEFENDANTS</strong>

21.     Pocomoke City is a municipality in Worcester County, Maryland, and is incorporated under Maryland law. Pocomoke City has the capacity under Maryland law to sue and be sued. Pocomoke City controls, and is ultimately responsible for, the actions and omissions of the Pocomoke City Police Department. Pocomoke City is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, and a covered employer under the Fair Labor Standards Act.

22.     The County Commissioners of Worcester County is the governing body for the Worcester County and the Worcester County Sheriff's Office. The County Commissioners of Worcester County, on behalf of Worcester County, have the capacity under Maryland law to sue and be sued. The County Commissioners of Worcester County is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, subject to liability for violations of the First and Fourteenth Amendments to the United States Constitution.

23.     Reggie T. Mason is the current sheriff of Worcester County. Mason, in conjunction with the County Commissioners of Worcester County, controls and is ultimately responsible for, the actions and omissions of the Worcester County Sheriff's Office. During all times mentioned in this Complaint, Mason acted under the color of Maryland law. He is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, subject to liability for

violations of the First and Fourteenth Amendments to the United States Constitution. Mason is sued in his official capacity only.

24. Russell Blake is the former City Manager of Pocomoke City. Blake served as City Manager of Pocomoke City for 40 years—from 1975 to 2015. He resigned as City Manager the day before Chief Sewell was terminated. During all times mentioned in this Complaint, Blake acted under the color of Maryland law. He is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, subject to liability for violations of the First and Fourteenth Amendments to the U.S. Constitution and the Fair Labor Standards Act. Blake is sued in his individual capacity only.

25. Ernie Crofoot is the current city manager of Pocomoke City. During all times mentioned in this Complaint, Crofoot acted under the color of Maryland law. He is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, subject to liability for violations of the First and Fourteenth Amendments to the U.S. Constitution. Crofoot is sued individually, and in his official capacity as city manager.

26. Bruce Morrison is the mayor of Pocomoke City. During all times mentioned in this Complaint, Morrison acted under the color of Maryland law. He is subject a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985 and a covered employer under the Fair Labor Standards Act. Morrison is sued individually, and in his official capacity as mayor.

27. Beau Oglesby is the Maryland State's Attorney for Worcester County. During all times mentioned in this Complaint, Oglesby acted under the color of Maryland law. He is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, subject to liability for violations of the First and Fourteenth Amendment to the United States Constitution. Oglesby is sued in his individual capacity only.

28.     Nathaniel Passwaters is a Sergeant in the Worcester County Sheriff's Office.  He was one of two supervisors of the Joint Task Force.  Passwaters' responsibilities included direct supervision of Officer Savage and the other Joint Task Force members.  During all times mentioned in this Complaint, Passwaters acted under the color of Maryland law.  He is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, subject to liability for violations of the First and Fourteenth Amendments to the United States Constitution.  Passwaters is sued individually, and in his official capacity as a deputy sheriff.

29.     Brooks Phillips is a corporal in the Department of Maryland State Police.  He was a member of the Joint Task Force on which Officer Savage served.  During all times mentioned in this Complaint, Phillips acted under the color of Maryland law.  He is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, subject to liability for violations of the First and Fourteenth Amendments to the United States Constitutions.  Phillips is sued individually, and in his official capacity as a Department of Maryland State Police trooper.

30.     Dale Smack, the only African American named as a Defendant in this Complaint, is the Chief Deputy Sheriff of the Worcester County Sheriff's Office.  During all times mentioned in this Complaint, Smack acted under the color of Maryland law.  He is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, subject to liability for violations of the First and Fourteenth Amendments to the United States Constitutions.  Smack is sued individually, and in his official capacity as a Worcester County Sheriff's Office Deputy.

31.     Rodney Wells is a Corporal in the Worcester County Sheriff's Office.  He was a member of the Joint Task Force on which Officer Savage served.  During all times mentioned in this Complaint, Wells acted under the color of Maryland law.  He is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, subject to liability for violations of the First and

Fourteenth Amendments to the United States Constitutions. Wells is sued individually, and in his official capacity as a Worcester County Sheriff's Office Corporal.

32.     Patricia Donaldson is a Sergeant in the Department of the Maryland State Police. Donaldson was the other supervisor of the Joint Task Force, and thus also supervised Officer Savage, along with Defendant Passwaters. Donaldson knew of and condoned some of the wrongful acts and omissions described of in this Complaint. Donaldson took no action as a supervisor on the Joint Task Force to end the discrimination against Officer Savage or to discipline or punish the offenders, thus allowing it to continue unabated. During all times mentioned in this Complaint, Donaldson acted under the color of Maryland law. She is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, subject to liability for violations of the First and Fourteenth Amendments to the United States Constitutions. Donaldson is sued in her official and individual capacities.

**FACTUAL ALLEGATIONS**

*About Pocomoke City*

33.     Once a major shipping town along the Pocomoke River, Pocomoke City sits in the southwest corner of Worcester County, Maryland's easternmost county. The nearest town of any size, Salisbury, is a half-hour to the north; Ocean City is forty-five minutes to the northeast. By car, Pocomoke City is slightly closer to Norfolk than Annapolis. In between these cities and Pocomoke City, and in every other direction, are miles of farm fields and hunting grounds.

34.     Pocomoke City and the surrounding area have an unfortunate past with respect to race relations. The area was slaveholding and lies south of the Mason-Dixon Line. The City remains highly residentially segregated. Almost half of the population is African American. Historically, the government of the City has been entirely White.

35.     Pocomoke City is governed by its mayor, city manager, and city council.

36.     The office of mayor is an elected position.  The mayor must be a resident of and registered voter in Pocomoke City.  The mayor holds his or her office for a three-year term.  In this role, the mayor presides over the city council.  The Pocomoke City Charter states:  "The [m]ayor may take part in all [city council] discussions, but shall have no vote."  Pocomoke City Charter § C-8.

37.     The city council consists of five elected individuals who each must be a resident of Pocomoke City for at least one year prior to their election.  Each council member is elected to represent a single geographic district within the city's borders for a three-year term.[1]

38.     The city manager is appointed for an indefinite term by the city council.  While serving in this capacity, the city manager must be a resident of Pocomoke City.  The city manager "shall have power and shall be required to appoint and, when necessary for the good of service, suspend or remove all officers and employees of the City."  The city manager may hire and fire Pocomoke City employees, including police officers.  Ultimately, the city manager is responsible for "the proper administration" of Pocomoke City.  Pocomoke City Charter § C-23.

39.     According to 2010 Census data, just over 45 percent of Pocomoke City's 4,000 residents identify as Black or African American, and just fewer than 50 percent of its residents identify as White.

40.     Despite these demographics, Pocomoke City is managed almost entirely by its White citizens.  The mayor, Morrison, is White.  Blake, the city manager for forty years, is White.  Crofoot, Blake's replacement, is White.  All members of the city council are White,

---

[1] The City's election system was changed from an at-large system to a districted system as a result of successful voting rights litigation brought by African American residents in the mid-1980s, challenging the at-large system and the City's all-white government as racially discriminatory.

except for one, Diane Downing.[2]

***About the Pocomoke City Police Department***

41.     The Pocomoke City Police Department is an agency of the Pocomoke City government, consisting of up to sixteen law-enforcement officers.  The officers are ranked from the entry-level rank of patrolman through chief of police.  The chief of police leads the department.  Two lieutenants report to the chief; one lieutenant manages the operations of officers while the other manages administrative matters.

42.     The chief reports to both the mayor and the city manager.  Under this arrangement, Chief Sewell reported to both Morrison and Blake while leading the department.

43.     As city manager, however, Blake had final authority and acted as if it was solely within his power to make personnel decisions for the Pocomoke City Police Department.

44.     On several occasions, Chief Sewell submitted his annual budget, which included suggested salaries for the police department employees, to Blake, who should have then reviewed the budget and submitted it to the city council.  Instead, Blake completely disregarded Chief Sewell's budget and submitted a single, handwritten sheet of paper setting forth Blake's own suggested compensation amounts for the police department employees.

45.     In October 2011, Blake informed Chief Sewell that his salary would not be adjusted for his promotion to captain.

46.     Despite Pocomoke City's significantly improved crime statistics during Chief Sewell's tenure, he did not receive annual raises, compensatory time, or paid health insurance, as other White chiefs had in the past.

47.     On information and belief, the chief of police prior to Chief Sewell received a

---

[2] In the Spring of 2015, the City installed Dale Trotter, a White male, to represent District 4, a majority African American district, through an unlawful cancellation of the election and blocking of Sheila Palmer's candidacy for the District 4 Council Seat.

raise each year he served as chief. Chief Sewell received his first and only pay raise when he

was promoted to chief on December 1, 2011. Pocomoke City, acting through Blake, also

declined to enter into an employment contract with Chief Sewell when he assumed his role as

chief. On information and belief, past White Pocomoke City police chiefs received employment

contracts defining benefits and terms of severance, including severance pay.

48.     Chief Sewell observed that African American officers within the Pocomoke City

Police Department were generally underpaid. None of the African American officers received

the pay raises he requested.

49.      From the time of Chief Sewell's promotion to chief through his termination,

neither Lieutenant Green nor Officer Savage received pay raises.

50.     On more than one occasion, Chief Sewell recommended pay raises for Lieutenant

Green and Officer Savage at the same time as other White officers.

51.     On information and belief, other White police officers of similar rank and

performance to Lieutenant Green and Officer Savage received pay raises during the same period.

52.     Pocomoke City, acting through Blake, provided no explanation for denying Chief

Sewell's recommendation regarding raises for African American officers while simultaneously

granting raises to White officers.

***About the Joint Task Force***

53.     In February 2012, Officer Savage was assigned to the Joint Task Force as a

narcotics investigator. The Joint Task Force is a multijurisdictional drug enforcement unit led by

the Worcester County Sheriff's Office. Most Joint Task Force members are members of

Worcester County Sheriff's Office, but other Maryland law enforcement agencies, including the

Department of Maryland State Police and the Ocean City Police Department, regularly detail

15

officers for set periods of time.

54. The duties of Joint Task Force members are akin to the duties of a deputy employed by the Worcester County Sheriff's Office.

55. At the time Officer Savage began working with the Joint Task Force, it was housed in the same building as the Worcester County Sheriff's Office.

56. In or about June 2012, the Joint Task Force moved from the Worcester County Sheriff's Office to its own separate, off-site location within Worcester County.

57. The vehicles and other equipment for surveillance and arrest were provided to Joint Task Force members by the Department of Maryland State Police and the Worcester County Sheriff's Office.

58. The Department of Maryland State Police and the Worcester County Sheriff's Office also each designated one member from each unit to serve as supervisors of the Joint Task Force.

59. Upon information and belief, these supervisors were delegated policymaking authority to determine the duties and priorities of the Joint Task Force, set personnel policies within the Joint Task Force, and supervise the use of technology and use of Joint Task Force equipment.

60. By both action and omission, the Joint Task Force supervisors also established customs and practices within the Joint Task Force.

61. At the time Officer Savage was a member of the Joint Task Force, the six other members of the Joint Task Force were all White males, with the exception of Donaldson, a White female.

62. The members of the Joint Task Force included the following defendants:

Passwaters, Donaldson, Phillips, and Wells.  The members also included Jeff Johns and Brian Trader.

63.     The Joint Task Force was supervised by Passwaters and Donaldson.  They were Officer Savage's immediate supervisors.

64.     As the Joint Task Force's supervisors, Passwaters and Donaldson were required to report misconduct by any Joint Task Force member to that member's parent agency.  The parent agency has the authority to discipline its detailed Joint Task Force members.

65.     Passwaters and Donaldson also determined Officer Savage's duties during his time on the Joint Task Force and were responsible for preparing his employment evaluation and forwarding that report to Chief Sewell.  That evaluation could affect Officer Savage's rank, pay, and future prospects within the Pocomoke City Police Department.

***The Joint Task Force's Racially Hostile Work Environment***

66.     Shortly after Officer Savage's appointment to the Joint Task Force in or around May 2012, after the Joint Task Force relocated to its new office, the other six Joint Task Force members began discriminating against Officer Savage.

67.     Phillips and Passwaters regularly referred to African Americans as "niggers" in Officer Savage's presence.  They repeatedly used the word in a sarcastic or demeaning tone to Officer Savage both orally and in written communications.  Savage would also hear Phillips and Passwaters refer to African American suspects as "niggers" or variations thereof.

68.     Beginning in 2012, once or twice a week, Wells streamed racially-charged videos that used the word "nigger" on his official work computer.  Members of the Joint Task Force crowded around Wells' computer and watched and laughed about these videos.  Officer Savage observed this behavior because his assigned desk was located next to Wells' assigned desk.

69.     In or around September 2012, Wells asked Officer Savage why African Americans are offended when a White person uses the word "nigger" and its variants.  Wells then asked Officer Savage how he would personally feel if he called him a "nigger."  Officer Savage indicated that he would be offended.

70.     On September 16, 2012, Wells and Passwaters arrested an African American man for drug possession.  The suspect used the word "nigger" and its variants several times during the arrest.  After viewing the dash camera footage of the arrest, Passwaters played and replayed the footage in front of the entire Joint Task Force because he thought the footage was funny.  During this incident, Passwaters informed members of the Joint Task Force that "he [was] about to drop the n-bomb," referring to the word "nigger."  After Passwaters gave this "warning," he, himself, proceeded to say the word.

71.     On occasion, Passwaters also referred to African Americans as "ninjas."  Inside the Joint Task Force, "ninja" was a known synonym for "nigger" based on a statement made during a previous investigation.

72.     In December 2012, Passwaters, Trader, and Wells repeatedly spoke to Officer Savage about lynchings and the Ku Klux Klan.

73.     On one occasion, Phillips, Trader, Wells, and Donaldson took Officer Savage to "KKK Lane" in Stockton, Maryland in Officer Savage's official covert vehicle provided by the Worcester County Sheriff's Office.

74.     At that time, the Joint Task Force had no official duties in Stockton.

75.     Wells and Trader told Officer Savage that he might see some Klan members or a noose in Stockton.

76.     On or about this same time, Wells told Officer Savage about a chest in his attic in

18

which he kept "white sheets and nooses."

77.     Phillips later informed Passwaters, one of the Joint Task Force's two supervisors, that he and others had taken Officer Savage to "KKK Lane."

78.     Passwaters merely responded with "OK."  Despite his authority to set personnel policies for the Joint Task Force, Passwaters took no action.

79.     On December 17, 2013, Officer Savage found a bloody deer's tail on the windshield of his car, which was parked on a side street by the Joint Task Force office.

80.     Officer Savage reported the incident to Passwaters.  Passwaters, as a supervisor who is responsible for investigating workplace conditions, went to Officer Savage's car to see the deer tail.

81.     Upon returning to the Joint Task Force office, Passwaters asked the other Joint Task Force members if they had any knowledge of the incident.  Immediately after Passwaters' inquiry, Phillips began laughing.

82.     Donaldson later sent Officer Savage a text message acknowledging that Phillips placed the bloody deer's tail on Officer Savage's car.  A true and correct copy of Donaldson's text message is attached as Exhibit A to this Complaint and incorporated by reference as if fully set forth herein.

83.     On information and belief, neither Passwaters nor Donaldson took any action to discipline or punish Phillips for his involvement in the bloody deer tail incident.

84.     Following the bloody deer's tail incident, Officer Savage felt that he could not report the ongoing harassment to Passwaters and Donaldson, his Joint Task Force supervisors, because Passwaters was actively involved in the harassment and both Passwaters and Donaldson had indicated by their previous inaction that they would not do anything to halt the

19

discriminatory behavior.

85.　　Officer Savage was also hesitant to report the harassment outside of the Joint Task Force because he feared retaliation from City Manager Blake, Councilmember Dale Trotter, and Worcester County State's Attorney Oglesby—powerful figures in the Eastern Shore community who had authority over his employment conditions and who later would become aligned against him.

86.　　In April 2014, Officer Savage found in his desk drawer a fake food stamp on which an image of President Obama had been imposed, which Officer Savage took to be ridiculing African Americans.  A true and correct copy of the fake food stamp placed in Officer Savage's desk drawer is attached as Exhibit B to this Complaint and incorporated by reference as if fully set forth herein.  On information and belief, only Officer Savage, and none of the other Joint Task Force members, received such a food stamp.

87.　　Officer Savage verbally reported the fake food stamp incident to Chief Sewell at or around the time of this occurrence in April 2014.

88.　　On May 31, 2014, Phillips sent Officer Savage a text that read: "What's ya body count nigga?  I'm in double digits."  A true and correct copy of Phillips' text message is attached as Exhibit C to this Complaint and incorporated by reference as if fully set forth herein.

89.　　Chief Sewell wrote a letter to Colonel Marcus L. Brown, the then-Secretary of the Department of Maryland State Police, regarding the May 31 incident.

90.　　After Savage began reporting the racial harassment outside of the Joint Task Force's chain of command, Passwaters and Phillips began to spread false rumors about Officer Savage that made it impossible for Officer Savage to perform his job, first in the Joint Task Force and then at the Pocomoke City Police Department.

91.     On June 3, 2014, Passwaters accused Officer Savage of repeated tardiness and alleged that Officer Savage's debt collectors and "wife" were repeatedly calling the Worcester County Sheriff's Office.  Officer Savage has never been married and these calls did not exist. Passwaters had no documents or other support for these allegations.

92.     On or about June 3, 2014, at the Joint Task Force's briefing prior to an undercover controlled substance purchase, Passwaters asked Officer Savage if he was on drugs.

93.     During that purchase, Phillips burned some of the marijuana—one of the substances obtained by the Joint Task Force during the purchase.  When an Ocean City Police Department officer with whom the Joint Task Force was working commented on the smell in the police vehicle, Phillips told the officer that Officer Savage had been smoking the marijuana. Photographs of the marijuana and pipe that Phillips used are attached as Exhibit D to this Complaint and incorporated by reference as if fully set forth herein.

94.     The next day, on June 4, 2014, Officer Savage informed Chief Sewell that Passwaters asked Officer Savage if he was on drugs.  Chief Sewell then instructed Officer Savage to undergo a drug screening, in order to disprove this false allegation.

95.     On June 6, 2014, Officer Savage underwent the drug screening ordered by Chief Sewell.  The test results were negative for any unlawful substance, including marijuana.

96.     The racially-hostile environment and the use of the word "nigger" orally and in written form aimed at Officer Savage or in Officer Savage's presence continued through the remainder of his service on the Joint Task Force.

97.     Officer Savage was insulted and offended by the Joint Task Force's racially-hostile work environment.

98.     Officer Savage was further offended by the participation of his supervisors, their

21

ratification of the racial epithets and racially discriminatory conduct, and their failure to intervene to stop the conduct or recommend discipline.

99.     Officer Savage was also physically and psychologically harmed by the racially-hostile work environment created by the Joint Task Force.

100.     As a member of the Joint Task Force, Officer Savage had consistently positive performance reviews from his supervisors, prior to his complaints about the race discrimination he encountered there.

101.     For example, on September 20, 2013, in Officer Savage's annual employee performance evaluation, Passwaters wrote that Officer Savage is "reliable" and "very trustworthy with sensitive information."

102.     Officer Savage's evaluations were forwarded by Donaldson and/or Passwaters to Chief Sewell, the chief of police of the Pocomoke City Police Department, who could use them to alter Officer Savage's conditions of employment, such as his continued detail to the Joint Task Force, rank promotions, and raises.

103.     Irrespective of their overall treatment of Officer Savage, in or around April 2014, Officer Savage's colleagues and superiors wrote positive letters of recommendation on his behalf, supporting his applications to other police departments.  True and correct copies of some of these letters of recommendation are attached as Exhibit E to this Complaint and incorporated by reference as if fully set forth herein.

104.     Comparing this temporal juxtaposition of glowing reviews and recommendation letters in early 2014 with condemnation and derogatory comments against Officer Savage in the fall of 2014 demonstrates the retaliatory and racially discriminatory nature of the negative letters and reviews against Officer Savage.

*Racially Offensive Conduct by the State's Attorney for Worcester County*

105.    State's Attorney Beau Oglesby leads the office that is solely responsible for prosecuting the cases investigated by the Pocomoke City Police Department and the cases brought by the Joint Task Force within its jurisdiction.  In this capacity, Oglesby frequently interacted with all three of the Plaintiffs and made decisions on which of their cases he would prosecute.

106.    On April 7, 2014, during a meeting with Officer Savage, Passwaters, and Assistant State's Attorneys Kelly Hurley and Ajene Turnbull, Oglesby read a series of letters written by a suspect, placing particular emphasis on and repeatedly saying the word "nigga."

107.    Mid-way through reading the letters, Oglesby paused and asked whether anyone in the room was offended.  At that moment, Assistant State's Attorney Turnbull, the only African American present other than Officer Savage, left the room.

108.    Oglesby then continued reading the letters aloud, and continued saying "nigga."

109.    Ultimately, Oglesby read the word "nigga" in the letters to the assembled prosecutors and police officers more than ten times.  True and correct copies of the letters Oglesby read from during this incident on April 7, 2014 are attached to this Complaint as Exhibit F and incorporated by reference as if fully set forth herein.

110.    Oglesby's reading of the word "nigga" in the letters and his use of the word were unnecessary and irrelevant to the prosecution of the case in connection with which the letters were obtained.

111.    On information and belief, the April 7, 2014 meeting between Savage and Oglesby was entirely investigatory in nature.

112.    On information and belief, the April 7, 2014 meeting was held prior to any

23

charges being filed against the potential defendants who wrote or were referenced in the letters read by Oglesby.

***Savage Resigns from the Joint Task Force and Complains about His Treatment; Retaliation Begins***

113.    On June 12, 2014, Officer Savage resigned from the Joint Task Force, citing the repeated use of the word "nigger" and variations thereof by his superiors and colleagues and a hostile work environment.

114.    Upon Officer Savage's resignation from the Joint Task Force, Worcester County Sheriff's Office members spread rumors about Officer Savage's honor and integrity with increasing frequency, which threatened his ability to perform his job.

115.    Worcester County Sheriff's Office members knew or should have known that these rumors were without foundation and a manifestation and perpetuation of the overt racial discrimination to which Officer Savage had been subjected while serving on the Joint Task Force.

116.    On June 23, 2014, Bernard B. Foster, the then-Chief of Staff for the Office of the Superintendent in the Maryland State Police, responded to Chief Sewell's May 31, 2014 letter concerning the bloody deer tail incident, stating that the letter was received and that Detective Sergeant Kelly Austin was assigned to this administrative investigation.

117.    Later, in a letter addressed to Officer Savage, Lieutenant M. B. Daugherty of the Criminal Enforcement Division of the Maryland State Police wrote that Detective Sergeant Kelly concluded that Phillips "violated the rules and regulations of the Maryland State Police with Unbecoming Conduct."  A true and correct copy of Lieutenant Daugherty's letter is attached as Exhibit G to this Complaint and incorporated by reference as if fully set forth herein.

118.    On information and belief, despite acknowledging that Officer Savage's

allegations against Phillips were well-founded, the Department of Maryland State Police has taken no disciplinary action of any kind against Phillips to date.

119.     On July 15, 2014, Passwaters spread a false rumor to Morrison and Blake that Officer Savage used the false identification he had been issued for undercover work to secure multiple fraudulent loans.

120.     Despite knowledge of past discriminatory conduct on the Joint Task Force and with no evidence to substantiate Passwaters' allegations, Blake demanded that Chief Sewell investigate this allegation.

121.     Officer Savage returned the false identification to Chief Sewell.  The allegation that Officer Savage had misused the undercover identification document(s) was false and was designed to injure Officer Savage's credibility and reputation.

122.     Around this same time, in mid-July 2014, Officer Savage noticed that he was no longer listed as a "detective" in the Pocomoke City employee database, which he took as a form of public humiliation and falsely suggesting that he had been demoted.

123.     As a result of past overt racial harassment and its perpetuation through false rumors, on July 21, 2014, Officer Savage filed a complaint against the Worcester County Sheriff's Office with the EEOC.

124.     On July 22, 2014, Officer Savage filed a complaint against Oglesby with the Maryland Attorney Grievance Commission regarding the April 7, 2014 incident described in paragraphs 105 through 112, supra.  Officer Savage's complaint explained that he was "very offended" by Oglesby's repeated and gratuitous use of "the word Nigga so freely and without care in front of ASA Turnbull and [himself]."  The letter also noted a subsequent "difference in [Oglesby's] approach and actions towards" [sic] Officer Savage following the incident.

125.    Oglesby treated Officer Savage in a markedly different and less respectful manner both in and out of court after Officer Savage complained of Oglesby's racially discriminatory use of the word "nigga" on April 7, 2014.

126.    The complaint concluded by stating that Officer Savage "had problems sleeping as a result of constantly thinking of [Oglesby] reading the 'N' word over and over again in those letters and not taken [sic] actions in stopping this matter."  A true and correct copy of Officer Savage's complaint to the Maryland Attorney Grievance Commission is attached as Exhibit H to this Complaint and incorporated by reference as if fully set forth herein.

127.    Upon information and belief, Oglesby learned of the complaint a week after it was filed.

128.    Following Officer Savage's reporting of the April 7, 2014 incident, Oglesby further treated Officer Savage differently.  Upon information and belief, the State's Attorney's Office no longer zealously prosecuted cases on which Officer Savage was the lead officer.

129.    This differential treatment of cases in which Officer Savage was involved was a mixture of retaliation for Officer Savage's reporting of racial harassment and continued racial harassment.

130.    On information and belief, by late July 2014, the highest officials who set policy for the Worcester County Sheriff's Office and Pocomoke City Police Department, including Mason, Smack, and Blake, were aware of Officer Savage's allegations of racial hostility against Oglesby, Passwaters, and other members of the Joint Task Force.

131.    In late July 2014, Passwaters continued his pattern of spreading false rumors about Officer Savage.

132.    At that time, Passwaters told Worcester County Sheriff's Office members that

Officer Savage sold his off-duty weapon.

133. To disprove this claim, Officer Savage brought the weapon to Chief Sewell, who took photographs of it.

134. On July 29, 2014, one of Passwaters' superiors at the Worcester County Sheriff's Office, Smack, drafted a memorandum to Chief Sewell accusing Officer Savage of falsely representing himself to suspects as a member of the Joint Task Force. In the memorandum, Smack wrote to Chief Sewell that the Joint Task Force would "not assist or participate in any investigative efforts set forth by Officer Savage."

135. Smack knew or should have known about the racial harassment on the Joint Task Force directed at Officer Savage. Nonetheless, his letter and attitude toward Officer Savage relied upon unsubstantiated and false allegations from Passwaters and perpetuated the racial harassment from the Joint Task Force by seeking to undermine Officer Savage's position with the Pocomoke City Police Department.

136. Contrary to Smack's letter, Officer Savage did not identify himself as a member of the Joint Task Force after his resignation from the Joint Task Force. This allegation was designed and intended to injure Officer Savage's reputation and credibility in his charges of racial discrimination against Oglesby and the Joint Task Force.

137. On the very same day as Smack's letter, Blake also accepted at face value rumors about Officer Savage—despite actual or constructive knowledge of the past racial discrimination against him on the Joint Task Force—and told Chief Sewell that Officer Savage would no longer be called on to testify in court against suspects in Officer Savage's cases, including narcotics cases.

138. Blake offered no performance-based explanation for his dictate.

139.     In a dangerous violation of his sworn duty, on August 14, 2014, Smack further told Chief Sewell that the Worcester County Sheriff's Office would not respond to any future emergency call or request for backup made by Officer Savage or Lieutenant Green.

140.     On at least two occasions, Officer Savage could not secure the assistance of a K-9 unit from the Worcester County Sheriff's Office, a regular procedure for the Pocomoke City Police Department.

141.     As a result of the retaliation and racial discrimination he was experiencing, on August 14, 2014, Officer Savage went on two weeks sick leave to deal with the stress caused by the aforementioned actions of his colleagues and former colleagues on the Joint Task Force and the Worcester County Sheriff's Office and Pocomoke City Police Department officers.

142.     While Officer Savage was on sick leave, on or about August 17, 2014, Blake instructed Chief Sewell to take Officer Savage out of narcotics work altogether.  Blake pressured Chief Sewell to assign Officer Savage to the undesirable midnight shift.  Blake also demanded that Officer Savage be made a patrol officer, allowed only to confirm that downtown doors were locked but forbidden from making any arrest.

143.     Throughout this period, Blake's actions continued to evidence racial discrimination mixed with retaliation.  Blake instigated heated arguments through email correspondence and verbal conversations with Chief Sewell over the treatment of Officer Savage.  On one occasion, Blake referred to Chief Sewell as an "ungrateful ass nigger" during the course of the discussion.

144.     After Officer Savage returned to work from his medical leave, Oglesby continued to block Officer Savage from testifying because of Officer Savage's decision to report past racially derogatory language.

145.     On September 4, 2014, Oglesby refused to acknowledge Officer Savage's presence in court and talked past him to Lieutenant Green to say that Officer Savage's presence would not be required to testify in a case that Officer Savage was handling.

146.     Oglesby's actions on September 4, 2014, were designed and intended to punish and intimidate Officer Savage for his complaints of discrimination against Oglesby and other Defendants.

147.     Less than a week later, Oglesby sent the Pocomoke City mayor and city council a letter implying that he would not allow Officer Savage to testify in court because he "question[ed] his veracity."

148.     On September 9, 2014, Chief Sewell was instructed by Blake to order Officer Savage to surrender the password to a work cell phone he used while with the Joint Task Force. Officer Savage was told that he would be disciplined by the Pocomoke City Police Department if he did not reveal the password.

149.     On or about September 11, 2014, Blake again instructed Chief Sewell to take Officer Savage out of narcotics work altogether and pressured Chief Sewell to assign Officer Savage to the midnight shift.

150.     On September 11, 2014, Officer Savage requested sick leave "until further notice" due to the "extreme stress and turmoil involving [his] current federal EEOC case and the recent letter from Oglesby, dated September 10, 2014."  As a result of Officer Savage's request, Blake required Chief Sewell to order Officer Savage to see a psychiatrist.  The psychiatrist cleared Officer Savage to return to active duty.

151.     On October 1, 2014, Officer Savage attended an EEOC mediation with Lieutenant Green, Smack, and Worcester County Lieutenant Michael McDermott ("McDermott").  Smack

and McDermott attended the mediation on behalf of the Worcester County Sheriff's Office. At the mediation, Smack and McDermott expressed open hostility toward Officer Savage and Lieutenant Green.

152. At the mediation, Smack told Lieutenant Green that he and Officer Savage were the causes of Pocomoke City's problems. Smack and McDermott also denied any responsibility or liability, arguing that the Pocomoke City Police Department was responsible for any discrimination, as Officer Savage's principal employer, rather than the Worcester County Sheriff's Office (even though no member of the Joint Task Force other than Savage was employed by the Pocomoke City Police Department.).

153. On October 13, 2014, Chief Sewell again ordered Officer Savage to see a psychiatrist "to be sure [that] the stress of [Officer Savage's] current situation does not diminish [his] fitness and effectiveness as an officer."

154. On October 15, 2014, Officer Savage underwent a psychiatric evaluation. The psychiatrist cleared Officer Savage to return to active duty.

155. Chief Sewell protested many of the orders of Blake to demote and otherwise penalize Officer Savage because he thought they constituted harassment and were the result of racial discrimination and retaliation and did not have any performance basis.

156. On October 14, 2014, Chief Sewell was asked to testify before a meeting of the mayor, city manager, and entire city council.

157. This meeting was a special meeting that included investigation of Blake's conduct, and no agenda or minutes are publicly available for the meeting. It was not a typical meeting of the city council to discuss city business, where an agenda is posted online prior to the meeting and minutes are posted after the meeting.

158.     During that meeting, Chief Sewell raised concerns that Blake was retaliating against Officer Savage because Officer Savage had reported racial discrimination.

159.     Because Chief Sewell believed there was no performance-based rationale for penalizing Officer Savage, he testified that Blake was using his position of authority to harass and retaliate against Officer Savage for his EEOC charges.  Chief Sewell told the council that Blake had ordered Chief Sewell to take disciplinary action against Officer Savage on a near daily basis.

160.     Blake became very upset during Chief Sewell's testimony and engaged in loud verbal arguments with Chief Sewell in front of the council.

161.     After the October 14, 2014, meeting, Blake continued to order adverse employment actions against Officer Savage, and Morrison also joined in several of these actions. To prevent this harassment, Chief Sewell had frequent conversations with members of the city council about Blake's misconduct and the need to refrain from punishing Officer Savage for his EEOC proceedings.

162.     These discussions with individual City Council members to prevent Blake from harassing Officer Savage and testimony before the specially convened council meeting investigating Blake's conduct were not part of Chief Sewell's daily responsibilities but were outside and beyond those duties.

163.     In mid-January 2015, Trotter directed Chief Sewell to cap the allowable overtime for Officer Savage and Lieutenant Green.  Officer Savage and Lieutenant Green regularly worked more than forty hours per week.  Neither Officer Savage nor Lieutenant Green had the largest amount of overtime for any officer.  No White officer had his or her overtime similarly capped.

31

164.     On February 9, 2015, Officer Savage was officially demoted from his position as detective to patrol officer allegedly "due to a shortage of patrol officers."  Blake and Morrison ordered Chief Sewell to take this action.  A true and correct copy of the letter demoting Officer Savage is attached as Exhibit I to this Complaint and incorporated as if fully set forth herein.

165.     Rudell Brown, a junior officer trained by Officer Savage who had not filed a complaint of discrimination, was promoted to detective immediately following Officer Savage's demotion.

166.     On March 9, 2015, Chief Sewell filed his own charge of discrimination with the EEOC alleging disparate treatment in employment terms against the Pocomoke City Police Department and the Worcester County Sheriff's Office.

167.     On March 12, 2015, an anonymous letter was left on the windshield of Chief Sewell's car saying that the "niggers" Officer Savage, Lieutenant Green, and Chief Sewell will be gotten rid of.  The letter also referred to Chief Sewell as a "smart nigger chief."  A true and correct copy of this anonymous letter is attached as Exhibit J to this Complaint and incorporated as if fully set forth herein.

168.     On April 10, 2015, in a meeting with George Tasker ("Tasker"), a member of the Pocomoke City Council, Chief Sewell explained that "Savage is the victim in his EEOC case and if [he] fire[s] him, [Savage] can sue [him], [Tasker], the Mayor and all the Council."

169.     Tasker replied that "Green is becoming a problem in [Sewell's] department to [sic] and once he and Savage is [sic] gone, that department well [sic] be okay."  Tasker also asked Chief Sewell whether he had heard what happened to Scott Keller, who was Chief of Police in Princess Anne County's Police Department before the Princess Anne Council voted him out of office on April 9, 2015.

170.    On or about May 4, 2015, Officer Savage was informed by a citizen of Pocomoke City that Blake and Morrison were circulating a petition to remove Officer Savage and Lieutenant Green from the Pocomoke City Police Department.

171.    On June 15, 2015, Chief Sewell filed his First Amended Charge of Discrimination with the EEOC against the Pocomoke City Police Department and the Worcester County Sheriff's Office.

172.    On June 30, 2015, Blake resigned as city manager of Pocomoke City.

173.    Before Blake's resignation, Chief Sewell was asked to resign as chief of police, despite significant reductions in crime during his tenure and no complaints about his performance from Pocomoke City officials or citizens.  On July 1, 2015, Morrison issued a letter terminating Chief Sewell as chief of police.

174.    The city council vote to terminate Chief Sewell was 4 to 1, with the only African American member of the city council, Diane Downing, dissenting from the decision to terminate Chief Sewell.

175.    Councilwoman Downing has repeatedly and publicly stated that the reasons given for the termination of Chief Sewell were entirely pretextual.

176.    Different city officials have given several different alleged reasons for the termination of Chief Sewell at different times.

177.    The firing of Chief Sewell was protested throughout Pocomoke City by both African American and White citizens because Chief Sewell had an excellent law enforcement record in Pocomoke City.

178.    On July 7, 2015, Lieutenant Earl Starner, a member of the Maryland State Police, was appointed interim Chief of the Pocomoke City Police Department.

179.     In August 2015, Crofoot became the City Manager and City Attorney of Pocomoke City.

180.     On August 17, 2015, Starner gave Officer Savage a letter stating that Officer Savage was being investigated by the Harford County Sheriff's Office for violating the Pocomoke City Police Department Code of Ethics because "[i]t is alleged that on July 22, 2015 [sic] you used the same language in a letter addressed to the Attorney Grievance Commission of Maryland.  This letter also contained the same misstated facts as mentioned above."  Officer Savage was required to sign this letter.

181.     This letter was in retaliation for Officer Savage's July 22, 2014 complaint—over a year earlier—to the Maryland Attorney Grievance Commission for Oglesby's use of the word "nigga" on April 7, 2014.

182.     On September 8, 2015, William Harden, Sr. was announced as the new chief of police of the Pocomoke City Police Department.

183.     On October 6, 2015, as required, Officer Savage attended an interrogation regarding the Harford County investigation.

184.     On or about October 16, 2015, Oglesby had a telephone conversation with Crofoot in which Oglesby was adamant that Officer Savage would never be able to testify again and was thus useless to the Pocomoke City Police Department.  On information and belief, Oglesby reiterated that Officer Savage should be terminated.

185.     On October 23, 2015, Paul Haskel, a Deputy State's Attorney in the Worcester County State's Attorney's Office, called the Pocomoke City Police Department advising that Officer Savage was not needed to testify in a trial in the Worcester County District Court.

186.     On October 26, 2015, Officer Savage was terminated from his position as an

officer with the Pocomoke City Police Department. Officer Savage was not afforded a right to a hearing or given any opportunity to appeal the decision. Prior to his termination, Officer Savage's duties were limited to administrative tasks, such as reviewing and filing police reports. Immediately after Officer Savage was terminated, members of the Joint Task Force began spreading rumors that Officer Savage was fired for using illegal narcotics.

187.     In firing Chief Sewell and Officer Savage, Pocomoke City, the Pocomoke City Police Department, the City Council, and Defendants Blake and Morrison did not follow required procedures, including those of the City Charter and the Maryland Law Enforcement Officers' Bill of Rights.

188.     Both Chief Sewell and Officer Savage were fired in retaliation for the exercise of their federal civil rights to be free from racial discrimination under the United States Constitution and laws of the United States.

189.     On March 1, 2016, Lieutenant Green resigned from the Pocomoke City Police Department because of severe health conditions that developed as a result of his employment with the police department.

190.     Due to the pervasive environment of racial animus, both Officer Savage and Lieutenant Green had to take medical leave on several occasions to get away from the stressful environment.

191.     Officer Savage, Chief Sewell, and Lieutenant Green each were aware of and observed discriminatory acts among themselves and other African American police officers.

192.     As a result of Defendants' discriminatory conduct, Plaintiffs have suffered, and in the future will continue to suffer, among other things, economic injury, humiliation, embarrassment, and mental and emotional distress.

193. Throughout the time period alleged in this Complaint, the racially discriminatory acts of the Defendants were both collective in nature and intertwined, and were also designed and intended to retaliate against the Plaintiffs for assertion of their civil rights.

194. On information and belief, other African American police officers serving on the Pocomoke City Police Department suffered racially discriminatory acts and a racially hostile work environment.

195. On information and belief, active racial discrimination, racially hostile work environment, and acts of retaliation for assertion of federal civil rights by African American police officers continue to the date of filing of this First Amended Complaint.

*Violations of Fair Labor Standards Act*

196. Officer Savage regularly worked more than forty hours per week during his tenure with the Pocomoke City Police Department.

197. Lieutenant Green regularly worked more than forty hours per week during his tenure with Pocomoke City Police Department.

198. Until approximately June 2014, Pocomoke City had a policy of not paying overtime unless the hours exceeded forty-three in one week.

199. Upon learning of this policy, Chief Sewell expressed concern about its legality.

200. In or around June 2014, Pocomoke City completed an audit of missed overtime wages between June 2011 and June 2014. The audit revealed that both Officer Savage and Lieutenant Green were owed overtime wages.

201. Blake falsely told the city council that Pocomoke City had fully compensated its employees for the three years' worth of missed overtime wages.

202. In fact, neither Officer Savage nor Lieutenant Green received any compensation

for their unpaid overtime wages.

203.    Defendants' failure to pay Officer Savage's and Lieutenant Green's full overtime wages, even after the audit had confirmed both the fact that Pocomoke City owed Officer Savage and Lieutenant Green overtime wages and the amount of such wages owed, constitutes willful, knowing, and intentional violations of Fair Labor Standards Act.

## CLAIMS FOR RELIEF[3]

### COUNT I
### RACE DISCRIMINATION AND RETALIATION IN VIOLATION of the FOURTEENTH AMENDMENT and 42 U.S.C. § 1983
### (Hostile Work Environment)
### (Savage v. Pocomoke City, Worcester County, Mason, Passwaters, Phillips, Wells, and Donaldson)

204.    Officer Savage alleges and incorporates each of the factual allegations stated in paragraphs 1 through 203 above.

205.    The Fourteenth Amendment to the United States Constitution guarantees citizens equal protection of the laws of the United States, with violations thereof giving rise to claims for relief under 42 U.S.C. § 1983.

206.    42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the United States Constitution and laws" by persons acting under the color of law.  The right to be free from racial discrimination in employment and retaliation for assertion of one's civil rights were both clear and well-established rights, known to each of the Defendants in this action throughout the time period of the allegations of this Complaint.

207.    Pocomoke City is a municipal corporation, and Pocomoke City Police Department is an instrumentality of Pocomoke City.  Pocomoke City is liable under 42 U.S.C. §

---

[3]As noted above, Plaintiffs expect to amend this Complaint to include Title VII allegations when all of their EEOC charges have matured for suit.

1983 because a custom, practice, or policy of the municipality caused the violations of Plaintiffs' constitutional rights, and/or because city officials with final policymaking authority violated Plaintiffs' constitutional rights. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

208.    Worcester County controls the practices of the Worcester County Sheriff's Office. As such, Worcester County is liable as Officer Savage's joint-employer. *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015). Specifically, during Officer Savage's tenure on the Joint Task Force, the Worcester County Sheriff's Office and Defendant Passwaters, a sergeant with the Worcester County Sheriff's Office and one of the assigned supervisors of the Joint Task Force, exercised significant control over Officer Savage, supervised his day-to-day activities, and furnished his equipment and place of work.

209.    By the acts and omissions described above, Defendants Pocomoke City, Worcester County, Mason, Passwaters, Phillips, Wells, and Donaldson, acting under color of state law, have maintained a pattern and practice of race discrimination and retaliation, creating a hostile work environment. Defendants used racial epithets directed toward or in the presence of Officer Savage regularly. The behavior by the above listed Defendants occurred when the Defendants were acting within the scope of their employment and used incidents and tools of their employment.

210.    Defendants' conduct was both severe and pervasive, especially given that the racial epithets expressed by Passwaters, Phillips, and Wells were either spoken or condoned by Officer Savage's supervisors, Defendants Donaldson and Passwaters. That is, the hostile work environment was caused or condoned by the Joint Task Force, and by Defendants Donaldson and Passwaters, the final policy making officials of the Joint Task Force. Officer Savage had a good

faith and reasonable basis to complain about race discrimination, constituting protected activity.

211.    Pursuant to their practices, Defendants have deprived Plaintiff of his rights to equal protection of the law, in violation of the Fourteenth Amendment to the United States Constitution, giving rise to his claims for relief under 42 U.S.C. § 1983.

212.    Defendants' discriminatory practice caused Officer Savage harm, including severe emotional distress, medical bills, and lost wages and benefits.

**COUNT II**
**RACE DISCRIMINATION AND RETALIATION IN VIOLATION of the**
**FOURTEENTH AMENDMENT and 42 U.S.C. § 1983**
**(Termination)**
**(Savage v. Pocomoke City and Blake)**
**(Sewell v. Pocomoke City and Morrison)**

213.    Plaintiffs allege and incorporate each of the factual allegations stated in paragraphs 1 through 203 above.

214.    The Fourteenth Amendment to the United States Constitution guarantees citizens equal protection of the laws of the United States, with violations thereof giving rise to claims for relief under 42 U.S.C. § 1983.

215.    42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the United States Constitution and laws" by persons acting under the color of law.  The right to be free from racial discrimination in employment and retaliation for assertion of one's civil rights were both clear and well-established rights, known to each of the Defendants in this action throughout the time period of the allegations of this Complaint.

216.    Pocomoke City is a municipal corporation, and Pocomoke City Police Department is an instrumentality of Pocomoke City.  Pocomoke City is liable under 42 U.S.C. § 1983 because a custom, practice, or policy of the municipality caused the violations of Plaintiffs' constitutional rights, and/or because city officials with final policymaking authority

39

violated Plaintiffs' constitutional rights.  *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

217.    Officer Savage had a good faith and reasonable basis to complain about race discrimination, constituting protected activity.

218.    Although he had a history of positive performance evaluations, Officer Savage was terminated from his position by the named Defendants on October 26, 2015.  This termination was motivated in whole or in part by Officer Savage's race and/or in retaliation for Officer Savage's protected activity of complaining about race discrimination.

219.    Despite Pocomoke City's improved crime statistics during Chief Sewell's tenure as the first African American Chief of Police for the Pocomoke City Police Department, Chief Sewell was terminated from his employment by the named Defendants on July 1, 2015.  This termination was motivated in whole or in part by Chief Sewell's race and by retaliation mixed with race-based discrimination and was an act of retaliation for Officer Savage's protected activity.

220.    In carrying out these wrongful terminations, Defendants have deprived Officer Savage and Chief Sewell of their rights to equal protection of the law, in violation of the Fourteenth Amendment to the United States Constitution, giving rise to his claims for relief under 42 U.S.C. § 1983.

221.    Defendants' discriminatory practices have caused Officer Savage and Chief Sewell harm, including severe emotional distress, medical bills, and lost wages and benefits.

## COUNT III
### RACE DISCRIMINATION AND RETALIATION IN VIOLATION of the FOURTEENTH AMENDMENT and 42 U.S.C. § 1983
#### (Disparate Treatment:  Benefits and Pay)
#### (All Plaintiffs v. Pocomoke City and Blake)

222.    Plaintiffs allege and incorporate each of the factual allegations stated in paragraphs 1 through 203 above.

223.    The Fourteenth Amendment to the United States Constitution guarantees citizens equal protection of the laws of the United States, with violations thereof giving rise to claims for relief under 42 U.S.C. § 1983.

224.    42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the United States Constitution and laws" by persons acting under the color of law.  The right to be free from racial discrimination in employment and retaliation for assertion of one's civil rights were both clear and well-established rights, known to each of the Defendants in this action throughout the time period of the allegations of this Complaint.

225.    Pocomoke City is a municipal corporation, and Pocomoke City Police Department is an instrumentality of Pocomoke City.  Pocomoke City is liable under 42 U.S.C. § 1983 because a custom, practice, or policy of the municipality caused the violations of Plaintiffs' constitutional rights, and/or because city officials with final policymaking authority violated Plaintiffs' constitutional rights.  *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

226.    Officer Savage had a good faith and reasonable basis to complain about race discrimination, constituting protected activity.

227.     As Pocomoke City Manager for nearly forty years, Defendant Blake was the city official responsible for determining the benefits and salaries of the Pocomoke City Police Department, including each of the Plaintiffs' benefits and salaries.

228.     Despite satisfactory job performance, Chief Sewell received lower pay and fewer benefits than similarly situated White police chiefs who had previously held the same position. Unlike his predecessors, Chief Sewell did not receive regular salary increases, compensatory time, paid health insurance, or an employment contract. As for Officer Savage and Lieutenant Green, they received lower pay than similarly situated White officers, and Chief Sewell's requests to raise their salaries were denied, despite similarly situated White officers receiving raises. Subsequently, as a result of engaging in statutorily protected activity, they also experienced retaliation with regards to pay and benefits, resulting in demotion and still more disparate benefits and pay, as detailed above.

229.     Pursuant to their practices, Defendants have deprived Plaintiffs of their rights to equal protection of the law, in violation of the Fourteenth Amendment to the United States Constitution, giving rise to their claims for relief under 42 U.S.C. § 1983.

230.     Defendants' discriminatory practice caused Plaintiffs harm, including severe emotional distress, medical bills, and lost wages and benefits.

**COUNT IV**
**RACE DISCRIMINATION and RETALIATION IN VIOLATION of the**
**FIRST AMENDMENT and 42 U.S.C. § 1983**
**(Free Speech and Right to Petition)**
**(Savage v. Oglesby, Blake, Passwaters, and Smack)**

231.     Officer Savage alleges and incorporates each of the factual allegations stated in paragraphs 1 through 203 above.

232.     The First Amendment to the United States Constitution guarantees the rights to

42

freedom of speech on matters of public concern and to petition the government for redress of grievances, with violations thereof giving rise to claims for relief under 42 U.S.C. §1983.

233.    Officer Savage engaged in protected activity when he exercised his First Amendment rights to free speech on matters of public concern to the community and to petition the government for grievances when he complained of the April 7, 2014, incident to the Maryland Attorney Grievance Commission as detailed in paragraphs 124 through 126.

234.    The day prior to his EEOC complaint against Oglesby, Officer Savage similarly exercised his First Amendment rights when he identified racial discrimination inside the Joint Task Force in a July 21, 2014, EEOC complaint filed against the Worcester County Sheriff's Office.

235.    In fact, several months prior to either complaint, Officer Savage's reports of racial discrimination inside the Joint Task Force were made known to the highest officials in Pocomoke City and the Worcester County's Sheriff's Office and were indisputably a matter of public concern.

236.    In April 2014, Officer Savage reported racial discrimination outside the Joint Task Force after a fake food stamp was left near his desk.  On May 31, 2014, he reported a second incident of a racially discriminatory text message, which Chief Sewell then described in a letter to the Department of Maryland State Police.  Finally, in his June 12, 2014, resignation letter, he raised the racial discrimination and hostility within the Joint Task Force for a third time.

237.    Defendants Blake, Passwaters, and Smack were aware that Officer Savage had raised separate issues of racial discrimination in his April, May, and June 2014 reports.  On or before Officer Savage's June 2014 resignation letter, Defendant Smack was also aware of the

racial discrimination Officer Savage had experienced within the Joint Task Force.

238.    In taking the above actions, Officer Savage spoke out as a citizen of the community.

239.    After learning that Officer Savage filed a grievance against Oglesby with the Attorney Grievance Commission, Oglesby prohibited Officer Savage from testifying on any case Officer Savage investigated.  This action was taken by Oglesby in his capacity as State's Attorney for Worcester County, in direct retaliation for Savage's protected speech.

240.    Testifying at trial in criminal prosecutions was a vital part of Officer Savage's duties as a police officer and, in particular, as a member of the Joint Task Force and of the Pocomoke City Police Department.

241.    Oglesby took the extraordinary step of writing a letter to the Mayor, Morrison, and the members of the City Council, falsely accusing Officer Savage of lying in his complaints of racial discrimination to the EEOC and the Maryland Attorney Grievance Commission against Oglesby.

242.    This action directly interfered with Plaintiff's ability to execute his job duties. Oglesby made this decision very soon after or on the exact day he was made aware of Officer Savage's complaint of racial harassment against him.

243.    Although Oglesby's behavior occurred while he was acting within the scope of his employment, using the power of the State's Attorney's Office, his retaliatory actions were outside of his duties as a state's attorney.

244.    After learning of Officer Savage's April and May 2014 reports, Passwaters began to retaliate against Office Savage's reporting of racial discrimination.  Without any factual basis, Passwaters falsely accused Officer Savage of tardiness and using drugs and claimed that Officer

Savage's debt collectors and "wife" were repeatedly calling the Worcester County Sheriff's Office.

245.    Passwaters acts of retaliation intensified after Officer Savage's June 2014 resignation letter.  Passwaters spread rumors to Defendants Blake and Smack that were untrue and which Blake and Smack knew or should have known were untrue based on Passwaters' prior participation in racial discrimination against Officer Savage on the Joint Task Force.

246.    Despite the obvious retaliatory motive of Passwaters, Blake and Smack adopted Passwaters' rumors without investigation and engaged in their own acts of retaliation.  These retaliatory acts directly harmed Officer Savage in his employment with the Pocomoke City Police Department.

247.    Passwaters, Blake and Smack each retaliated against Officer Savage for reporting the racial discrimination within the Joint Task Force.  Their acts of retaliation made it difficult or impossible for Officer Savage to fulfill his job responsibilities until such acts resulted in demotion and eventually termination.

248.    Blake demanded Chief Sewell investigate the meritless rumors of Passwaters.  Thereafter, Blake told Chief Sewell that Officer Savage could not testify in criminal cases and ordered Chief Sewell to refer Officer Savage to a psychiatrist, remove Officer Savage from narcotics work and assign him to the midnight shift.  Each of these acts occurred as a result of Officer Savage's reporting of racial discrimination, and would not have happened but for those reports.

249.    Blake's various retaliatory actions directly ordered adverse employment actions against Officer Savage.  Such actions will have a chilling effect on other public employees reporting racial harassment.

250. For his part, Smack wrote a letter accusing Officer Savage of using false identification and stating that the Worcester County Sheriff's Office would not send any backup for Officer Savage.

251. Smack's actions of refusing to provide Officer Savage with backup from the Worcester County Sheriff's Office and its K-9 unit writing a letter containing false allegations interfered with Officer Savage's duties as a police officer and, in particular, as an officer engaged in narcotics work, and will have a chilling effect on other employees filing grievances. Smack's actions were in retaliation for Officer Savage's reporting of racial discrimination within the Joint Task Force that included members of the Worcester County Sheriff's Office.

252. Pursuant to their practices, Defendants deprived Officer Savage of his rights under the First Amendment to the United States Constitution, giving rise to his claims for relief under 42 U.S.C. §1983.

253. Defendants' practices caused Officer Savage harm, including severe emotional distress, medical bills, and lost wages and benefits.

### COUNT V
### RACE DISCRIMINATION and RETALIATION IN VIOLATION of the FIRST AMENDMENT and 42 U.S.C. § 1983
### (Free Speech)
### (Sewell v. Pocomoke City, Blake, Morrison)

254. Chief Sewell alleges and incorporates each of the factual allegations stated in paragraphs 1 through 203 above.

255. Defendant Blake repeatedly pressured Chief Sewell to take adverse employment actions and other disciplinary actions against Officer Savage from approximately July 15, 2014, until Chief Sewell was terminated on July 1, 2015.

256. Chief Sewell protested many of these orders because, in his opinion, Blake's

orders were in furtherance of the racial discrimination against Officer Savage and in retaliation for his having reported that discrimination.

257.   On October 14, 2014, Chief Sewell was called to testify in a special, closed meeting of the entire Pocomoke City Council, Morrison, and Blake.

258.   While testifying before the Pocomoke City Council, Chief Sewell informed members of the Council that Blake unlawfully and without factual basis had ordered Chief Sewell to demote Officer Savage and to take other adverse employment actions, and that Blake's allegations about Sewell were a pretext to increase the pressure on Chief Sewell to take unlawful action against Officer Savage.  Chief Sewell encouraged the City Council to investigate and to take action to prevent Blake's misconduct.

259.   Following the October 14, 2014 meeting, Chief Sewell continued to raise concerns about misconduct by Blake to individual members of the city council.  Chief Sewell was concerned that Officer Savage had been the victim of racial discrimination and that Blake's orders were an effort to conceal that discrimination and to retaliate against Officer Savage for filing an EEOC complaint.

260.   Testifying before the Pocomoke City Council and expressing concerns to individual Council members who could investigate and prevent misconduct was speech that warrants First Amendment protection and was an act to inform the public of wrongdoing by Blake and others within City government.

261.   Chief Sewell's meetings with individual council members and testimony before the special meeting of the Council were outside and beyond any daily professional duties that Chief Sewell had with respect to the Council and individual Council members.

262.   When raising these concerns and urging Council members to prevent Blake's

discrimination and retaliation, Chief Sewell acted in the role of a citizen.

263.   Because Sewell raised allegations of misconduct against Blake to individual members of the council and during council meetings, Blake and Morrison made efforts to terminate Chief Sewell.

264.   Chief Sewell was asked to resign in late June 2015.

265.   On July 1, 2015, Chief Sewell was terminated by a letter from Morrison, who had final policymaking authority for Pocomoke City.  This action, taken in retaliation for Sewell's outspoken opposition to race discrimination and his refusal to condone discrimination against his subordinate employees, deprived Chief Sewell of his rights under the First Amendment to the United States Constitution.

266.   Defendants' practices caused Chief Sewell harm, including severe emotional distress, medical bills, and lost wages and benefits.

## COUNT VI
## CIVIL CONSPIRACY IN VIOLATION of 42 U.S.C. § 1985
### (Savage v. Oglesby, Blake, Crofoot, Passwaters, and Smack)

267.   Officer Savage alleges and incorporates each of the factual allegations stated in paragraphs 1 through 203 above.

268.   42 U.S.C. § 1985 prohibits conspiracies interfering with civil rights.

269.   Defendants Oglesby, Blake, Crofoot, Passwaters, and/or Smack engaged in a conspiracy and unlawful agreement to deprive Officer Savage of his constitutional and statutorily protected right to work in an environment free of racial harassment and his right not to suffer adverse employment actions on the basis of his race.  This conspiracy was motivated by animus with respect to Officer Savage's race.

270.   The purpose of the conspiracy was to discredit Officer Savage's valid complaints

of racial discrimination and retaliation in violation of his federal civil rights. The purpose of the conspiracy was also to obtain Officer Savage's termination from the Pocomoke City Police Department on a pretextual basis, knowing that the true motivation was racial discrimination in violation of federal law.

271. The purpose and effect of the conspiracy was part of the same effort by all Defendants effort to deprive Officer Savage of the substantive rights provided by the Fourteenth Amendment to the U.S. Constitution and by 42 U.S.C. § 1983 as alleged above.

272. Accordingly, Defendants have violated Officer Savage's rights as protected by 42 U.S.C. § 1985.

273. Defendants' practices caused Officer Savage harm, including severe emotional distress, medical bills, and lost wages and benefits.

## COUNT VII
### RACE DISCRIMINATION AND RETALIATION IN VIOLATION of 42 U.S.C. § 1981
### (Hostile Work Environment)
### (Savage v. Pocomoke City, County Commissioners of Worcester County, Mason, Blake, Crofoot, Morrison, Oglesby, Passwaters, Phillips, Smack, Wells, and Donaldson)

274. Plaintiffs allege and incorporate each of the factual allegations stated in paragraphs 1 through 203 above.

275. 42 U.S.C. § 1981 guarantees that all persons shall have the right to make and enforce contracts, including employment contracts free from all forms of discrimination on the basis of race and national origin. Section 1981 also prohibits retaliation against individuals who make complaints about racial discrimination in the creation and/or enforcement of contracts, including contracts for terms and condition of employment. The right to be free from racial discrimination in employment and retaliation for assertion of one's civil rights were both clear and well-established rights, known to each of the Defendants in this action throughout the time

49

period of the allegations of this Complaint.

276.    Officer Savage was employed by the Pocomoke City Police Department for a period of approximately four and one half years, from April 2011 to October 2015.

277.    Officer Savage was also a joint employee of the Pocomoke City Police Department, the Worcester County Sheriff's Office, the Maryland State Police, and the Joint Task Force for more than two years, from April 2012 to June of 2014.

278.    By the acts and omissions described above, Defendants, acting under color of state law, have maintained a pattern and practice of race discrimination and retaliation creating a hostile work environment.  Defendants used racial epithets directed toward, or in the presence of, Officer Savage regularly.  The behavior by the above listed Defendants occurred when the Defendants were acting within the scope of their employment and used incidents and tools of their employment

279.    Defendants' conduct was both severe and pervasive, especially given that the racial epithets were either spoken or condoned by Officer Savage's supervisors.  Moreover, the hostile work environment was caused by or custom of the Joint Task Force, and/or by Defendants Donaldson and Passwaters, the final policy making officials of the Joint Task Force. Officer Savage had a good faith and reasonable basis to complain about race discrimination, constituting protected activity under 42 U.S.C. § 1981.

280.    Defendants' practices caused Officer Savage harm, including severe emotional distress, medical bills, and lost wages and benefits.

### COUNT VIII
### VIOLATION of the FAIR LABOR STANDARDS ACT
### (Savage and Green v. Pocomoke City, Blake, and Morrison)

281.    Officer Savage and Lieutenant Green allege and incorporate each of the factual

allegations stated in paragraphs 1 through 203 above.

282.     Section 7(a)(1) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a)(1), provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

283.     Officer Savage and Lieutenant Green were "employees," and Defendants were their "employers" under FLSA § 3, 29 U.S.C. § 203.

284.     Officer Savage and Lieutenant Green were not paid overtime as detailed above.

285.     Officer Savage is not an exempt employee under Section 13(a)(1) of FLSA, 29 U.S.C. § 213(b)(14).  As a "police officer," the exemption also does not apply to him per 29 C.F.R. § 541.3(b).  Therefore, he was owed overtime pay of one and one-half times his regular pay for all hours worked above forty in one week.  FLSA § 7, 29 U.S.C. § 207.

286.     Lieutenant Green is not an exempt employee under Section 13(a)(1) of FLSA, 29 U.S.C.§ 213(b)(14).  As a "police officer," the exemption also does not apply to him per 29 C.F.R. § 541.3(b).  Therefore, he was owed overtime pay of one and one-half times his regular pay for all hours worked above forty in one week.  FLSA § 7, 29 U.S.C. § 207.

287.     Since at least June 2014, Pocomoke City has known that it owed this money to Plaintiffs.

288.     Defendants violated the FLSA by knowingly, willfully, and intentionally failing to compensate Plaintiffs, and all other similarly situated individuals, the rate of time-and-one-half their regular hourly rate for every hour worked in excess of forty hours in any one workweek.

289.    Therefore, Pocomoke City owes Officer Savage and Lieutenant Green back overtime wages, the same amount in addition as liquidated damages, and interest (both pre- and post-judgment) on the combined wages and liquidated damages.  FLSA § 16, 29 U.S.C. § 216 and 28 U.S.C. § 1961.

## PRAYER FOR RELIEF

Wherefore Officer Savage, Chief Sewell, and Lieutenant Green respectfully request that the Court:

1.      Enter judgment on their behalf against Defendants on all counts;

2.      Declare, pursuant to 28 U.S.C. § 2201, that through their acts and omissions, Defendants maintained a racially hostile work environment in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

3.      Declare, pursuant to 28 U.S.C. § 2201, that through their acts and omissions, Defendants unlawfully terminated Plaintiffs based upon their race in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

4.      Declare, pursuant to 28 U.S.C. § 2201, that through their acts and omissions, Defendants denied Plaintiffs equal wages and benefits based upon their race, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

5.      Declare, pursuant to 28 U.S.C. § 2201, that Defendants improperly retaliated against Plaintiffs based upon their exercise of their rights to free speech and to petition the government for redress of grievances, in violation of the First Amendment of the United States Constitution;

6.      Declare, pursuant to 28 U.S.C. § 2201, that Defendants engaged in a civil conspiracy against Plaintiffs for exercise of their civil rights in violation of 42 U.S.C. § 1985;

7.     Declare, pursuant to 28 U.S.C. § 2201, that by denying Plaintiffs overtime pay, Defendants knowingly, willingly, and intentionally violated the Fair Labor Standards Act, 29 U.S.C. § 207;

8.     Issue a permanent injunction that (i) prohibits Defendants, their officers, agents, employees, and successors from engaging in the discriminatory employment practices complained of herein; (ii) returns Plaintiffs to the employment positions they would have held but for Defendants' wrongful conduct; and (iii) imposes a prohibition of similar conduct in the future;

9.     Require three-year monitoring of all law enforcement activity by all Defendants to prevent any further racial discrimination in employment, including the hiring and training of new and current officers;

10.    Award Plaintiffs front pay and back pay with interest and other job benefits, including the value of health benefits, sufficient to redress all of the economic harms that they have suffered;

11.    Award liquidated damages in an equal amount to unpaid overtime pay pursuant to 29 U.S.C. § 216;

12.    Award Plaintiffs compensatory damages in an amount to be proven at trial sufficient to redress the harms that they have suffered, including physical and emotional distress, humiliation, embarrassment, loss of income, loss of overtime pay, and mental anguish;

13.    Award Plaintiffs appropriate punitive damages, against defendants in their individual capacities, in an amount to be proven at trial that would punish Defendants for their knowing, intentional, willful, and reckless disregard of clearly established federal constitutional and statutory rights as alleged herein and enter any and all injunctive decrees and relief necessary

to effectively prevent all Defendants from engaging in similar unlawful racial discrimination in the future;

14. Award Plaintiffs reasonable attorneys' fees under 42 U.S.C § 1988 and 29 U.S.C. § 216 and all taxable costs of this action;

15. Award such other and further relief in any form that this Court deems just and proper under the facts and circumstances as proved at trial.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial on all issues triable by a jury.

Dated:  March 16, 2016

Respectfully Submitted,

/s/ Christen B'anca Glenn_____
Andrew McBride (D. Md. Bar No. 27858)
Christen B'anca Glenn (D. Md. Bar No. 14945)
Dwayne Sam (D. Md. Bar No. 29947)
Craig Smith (D. Md. Bar No. 17938)
Craig Fansler (D. Md. Bar No. 19442)
Brian Walsh (*pro hac vice*)
**WILEY REIN LLP**
1776 K Street, N.W.
Washington, DC 20006
TEL: 202.719.7000
FAX: 202.719.7049
EMAIL: cglenn@wileyrein.com

Dennis A. Corkery (D. Md. Bar No. 19076)
Matthew Handley (D. Md. Bar No. 18636)
**WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS**
11 Dupont Circle, N.W.
Suite 400
Washington, DC 20036
TEL: 202.319.1000
FAX: 202.319.1010
EMAIL: Dennis_Corkery@washlaw.org

Deborah A. Jeon (D. Md. Bar No. 06905)
**ACLU of Maryland**
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211
TEL: 410.889.8555
FAX: 410.366.7838
EMAIL: jeon@aclu-md.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Amended Complaint was

served on all registered defendants through their counsel of record through the CM/ECF system

to their electronic addresses of record on this 16th day of March 2016 if they are registered users

or, if they are not, by electronic mail and by placing a true and correct copy in the United States

mail to their address of record:

Ronald M. Levitan
Genevieve G. Marshall
Assistant Attorneys General
Maryland Department of State of Police
1201 Reisterstown Road
Pikesville, MD 21208
(410) 653-4224
genevieve.marshall@maryland.gov
  *Counsel for Brooks Phillips, Patricia Donaldson, and Beau Oglesby*

Daniel Karp
Karpinski, Colaresi & Karp
120 E. Baltimore Street, Suite 1850
Baltimore, MD 21202
(410) 727-5000
brunokarp@bkcklaw.com
  *Counsel for Pocomoke City, Bruce Morrison, Russell Blake, and Ernie Crofoot*

Jason L. Levine
Assistant Attorney General
Maryland State Treasurer's Office
80 Calvert Street, 4th Floor
Annapolis, MD 21401
(410) 260-7412
jlevine@treasurer.state.md.us
  *Counsel for Reggie Mason, Nathaniel Passwaters, Dale Smack, and Rodney Wells*

/s/ Christen B'anca Glenn
Christen B'anca Glenn (D. Md. Bar No. 14945)
**WILEY REIN LLP**
1776 K Street, N.W.
Washington, DC 20006
TEL: 202.719.7000
FAX: 202.719.7049
EMAIL: cglenn@wileyrein.com

*Counsel for Plaintiffs*