**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | |
|---|---|
| FRANKLIN SAVAGE, | |
| KELVIN SEWELL, | |
| and LYNELL GREEN, | |
|       Plaintiffs, | |
| v. | |
| POCOMOKE CITY, | |
| COUNTY COMMISSIONERS OF WORCESTER COUNTY, | |
| REGGIE T. MASON, in his official capacity as Worcester County Sheriff, | **SECOND AMENDED COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, DAMAGES, AND ATTORNEYS' FEES** |
| STATE OF MARYLAND,       Serve on:  Brian Frosh       Attorney General       State of Maryland       200 St. Paul Place       Baltimore, MD 21202 | Civil Action No. 1:16-cv-00201-JFM

Jury Trial Demand |
| RUSSELL BLAKE, in his individual capacity only | |
| ERNIE CROFOOT, individually, and in his official capacity as Pocomoke City Manager | |
| BRUCE MORRISON, individually, and in his official capacity as Pocomoke City Mayor | |
| NATHANIEL PASSWATERS, in his individual capacity only | |

BROOKS PHILLIPS,
individually, and in his official capacity as a
Department of Maryland State Police Corporal

DALE SMACK,
in his individual capacity only

RODNEY WELLS,
in his individual capacity only

and PATRICIA DONALDSON,
individually, and in her official capacity as a
Department of Maryland State Police Sergeant

     Defendants.

**<u>INTRODUCTION</u>**

1.      This is one of the saddest and most shocking cases this Court is likely to address. Three African American police officers, working for Pocomoke City, Maryland, experienced racial discrimination in employment and retaliation for the exercise of their federal civil rights in a manner that most Americans would have believed unthinkable in the second decade of the Twenty-First Century.  While Pocomoke City bills itself as the "Friendliest Town on the Eastern Shore," its law enforcement community, including police officers and elected officials from the Pocomoke City Police Department, the Department of Maryland State Police, the Worcester County Sheriff's Office, and, most disappointingly, the Worcester County State's Attorney's Office, acted more in the vein of "Jim Crow."

2.      Three model police officers, including the first African American chief of police in Pocomoke City and the first and only African American detective assigned to the local narcotics task force, were mocked, threatened, demeaned, demoted, punished, falsely accused of misconduct, ostracized, and humiliated because of their race.  Ultimately, two of the Plaintiffs here, Franklin Savage ("Officer Savage") and Kelvin Sewell ("Chief Sewell"), were fired by Pocomoke City in obvious retaliation for their filing of United States Equal Employment Opportunity Commission ("EEOC") complaints and other protected activity.  The third officer, Lynell Green ("Lieutenant Green"), resigned from the Pocomoke City Police Department due to health concerns arising from his work environment.  The intervention of this Court is vitally necessary to make clear to some members of the law enforcement community on the Eastern Shore that this blatant disregard of federal constitutional and statutory rights will not be tolerated.

3.      The use of the word "nigger" long ago ceased to be tolerated in any American

3

workplace.  So, too, did other forms of racial mockery, epithets, threats, humiliation, and discrimination based on race in the terms of employment.  Yet, the three Plaintiffs in this action—Officer Savage, Chief Sewell, and Lieutenant Green—experienced unlawful conduct of this character, often on a daily basis.

4.     Officer Franklin Savage endured a hostile work environment and employment discrimination throughout his four-year tenure with the Pocomoke City Police Department.  He spent more than half of that time detailed to the Worcester County Criminal Enforcement Team ("CET"), a regional drug-interdiction task force, led by the Worcester County Sheriff's Office. Officer Savage was the first and only African American police officer ever assigned to the CET. For more than two years, members of the CET, and at least one other government official, used the word "nigger"—and its variants—in Officer Savage's presence numerous times.  They also subjected Officer Savage to other forms of racial harassment and discrimination, such as taking an on-duty side trip to a so-called "KKK Lane" and placing an altered food stamp in Officer Savage's desk drawer on which a picture of President Barack Obama had been superimposed.  A bloody deer's tail was placed on Officer Savage's car windshield on a side street by unknown members of the CET.

5.     One of Officer Savage's CET supervisors, Defendant Passwaters, participated actively in the racial discrimination against him.  His other supervisor on the CET, Defendant Donaldson, knew of the unlawful racially discriminatory acts but did nothing to stop them or discipline the offenders.

6.     When Officer Savage finally complained within the Pocomoke City Police Department about this racially-motivated mistreatment, and left the CET, he found himself railroaded out of law enforcement in Worcester County.  He was demoted without reason.  His

duties were restricted.  He was blackballed from testifying in criminal cases—an integral part of his duties as a police officer—by the county's State's Attorney.  In a hallmark of retaliation, the same Officer Savage, who had received glowing reviews and laudatory letters of recommendation for years, was suddenly described as an incompetent and untrustworthy officer. Officer Savage was then fired from the Pocomoke City Police Department without just cause and for stated reasons that are obvious pretexts for racial hostility and retaliation.

7.      The retaliation against Officer Savage also swept up the other Plaintiffs, Chief Kelvin Sewell and Lieutenant Lynell Green.

8.      Chief Sewell served as chief of the Pocomoke City Police Department for almost all of Officer Savage's employment, and, as noted above, was the first African American police chief of Pocomoke City.  He was fired from the Pocomoke City Police Department because he refused to fire Officer Savage in the face of pressure from various Pocomoke City and Worcester County employees and elected officials.  Chief Sewell refused to fire Officer Savage both because he saw no basis for his discharge and because Chief Sewell viewed firing Officer Savage as improper retaliation for Officer Savage's protected conduct in filing EEOC complaints against the very individuals who wanted him fired.

9.      Lieutenant Green, for his part, served as a lieutenant in the Pocomoke City Police Department for over four years.  As a show of support for Officer Savage, Lieutenant Green attended a mediation hearing regarding a claim that Officer Savage filed with the EEOC. Lieutenant Green then found himself on the wrong side of law enforcement officialdom in Worcester County.  For supporting Officer Savage, Lieutenant Green experienced repeated acts of retaliation from his fellow officers and Pocomoke City officials.  Lieutenant Green had his pay restricted by Pocomoke City, and was subject to Pocomoke City Police Department policies

5

that may appear facially neutral and broadly applicable but, upon scrutiny, were clearly targeted at Lieutenant Green alone.

10.     Plaintiffs are thus suing the individuals and entities responsible for this unchecked pattern and practice of virulent racial discrimination and retaliation.  They are also suing the officers, elected officials, law-enforcement agencies, and governmental entities that condoned or failed to stop this behavior.  Finally, they are suing those that orchestrated retaliation against the Plaintiffs, for seeking to remedy a racially hostile work environment and discrimination, and those who joined in unlawful retaliation against the three for supporting each other's protected conduct.  The acts of race discrimination and retaliation were collective of named Defendants and were mixed and intertwined with each other.

11.     Plaintiffs present numerous causes of action because race-based discrimination and retaliation are both clearly prohibited by federal laws, including the United States Constitution.  The asserted causes of action include those arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); 42 U.S.C. §§ 1981 and 1983, for violations of the First and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1985; and the Fair Labor Standards Act, 29 U.S.C. §§201-219.  This Second Amended Complaint is filed to place the now fully-exhausted Title VII claims before this Court.  It is worth noting that the EEOC found "reasonable cause to believe" that the vast majority of the allegations in the Plaintiffs' Title VII claims had merit.  The EEOC findings are attached as Exhibits A-1 to A-7 to this Second Amended Complaint and are incorporated as if fully set forth herein.

12.     The damages here are substantial.  Officer Savage and Chief Sewell have both been wrongfully fired.  Officer Savage has been unable to find new employment as a police officer and has suffered physical and psychological harm directly attributable to his

mistreatment.  Chief Sewell was unemployed for a period of several months following his termination and now works for the Baltimore City State's Attorney's Office.  Both Officer Savage and Chief Sewell seek front and back pay and damages for both physical and psychological harms as well as injunctive relief.  Lieutenant Green was left with resignation as his only option.  He seeks back pay for loss of overtime, as well as damages.  All Plaintiffs seek appropriate injunctive relief against all Defendants to ensure that the unlawful discrimination and retaliation does not occur in the future in Worcester County.  All Plaintiffs also seek costs and attorneys' fees under 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5, and such other relief as this Court deems just and proper.  All Plaintiffs demand a trial by jury.

## NATURE OF THE ACTION

13.     Plaintiffs bring this action under Title VII; 42 U.S.C. §§ 1981, 1983, and 1985; the Fair Labor Standards Act, 29 U.S.C. § 201-219; and the United States Constitution to remedy the unlawful discrimination and retaliation engaged in by Defendants Pocomoke City, the County Commissioners of Worcester County ("Worcester County"), Reggie T. Mason ("Mason"), Russell Blake ("Blake"), Ernie Crofoot ("Crofoot"), Bruce Morrison ("Morrison"), Nathaniel Passwaters ("Passwaters"), Brooks Phillips ("Phillips"), Dale Smack ("Smack"), Rodney Wells ("Wells"), Patricia Donaldson ("Donaldson"), and the State of Maryland.  As noted above, Plaintiffs file this Second Amended Complaint to bring the Title VII claims before the Court.  The legal standards under Title VII are different and, in many cases, more favorable to the Plaintiffs than the claims based on civil war era statutes presented in the First Amended Complaint.

7

**JURISDICTION AND VENUE**

14.     This Court has original jurisdiction over all Counts pursuant to 28 U.S.C. § 1331 because those claims arise under the United States Constitution and laws of the United States.

15.     Jurisdiction to grant a declaratory judgment is conferred by 28 U.S.C. §§ 2201-2202.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all of the events, acts, and/or omissions giving rise to Plaintiffs' claims occurred in the State of Maryland.  Specifically, most of them occurred in Worcester County, Maryland.

**PARTIES**

**PLAINTIFFS**

17.     Officer Savage joined the Pocomoke City Police Department in April 2011.  He began representing the Pocomoke City Police Department as an officer on the CET around February 2012.  Officer Savage was the first African American detailed to the CET.  He was known as an excellent narcotics officer—particularly in undercover narcotics buys—which was why he was detailed to this important position with the CET.

18.     In or around May 2012, Officer Savage was promoted to detective.  He resigned from the CET on June 12, 2014, and returned to the Pocomoke City Police Department as a detective.  After reporting the harassment and retaliatory behavior of which he had been victim while on the CET, Officer Savage was demoted from detective to officer on February 9, 2015.  He was told he could not make arrests alone or testify in court.  Eventually, he was demoted to patrolman, often relegated to checking doors on the night shift.  Officer Savage was unlawfully terminated from his position as a patrolman in the Pocomoke City Police Department on October

8

26, 2015.

19.     Chief Sewell joined the Pocomoke City Police Department in November 2010, upon retirement from the Baltimore City Police Department as a sergeant after twenty-two years of distinguished service.  He was hired as a lieutenant and served as the Pocomoke City Police Department's operations manager.  Chief Sewell was promoted to captain on October 1, 2011, and to chief of police on December 1, 2011.  Chief Sewell was the first African American to hold this position in Pocomoke City.  During his tenure as chief, there were no homicides in Pocomoke City.  Crime, particularly drug and street crime, dropped significantly during Chief Sewell's tenure.  Chief Sewell instituted community policing principles in Pocomoke City, and the relations between the police department and the citizenry, including the African American community, improved significantly.  Chief Sewell was respected by his officers and by the community.  He enjoyed a reputation as an excellent police chief.  Chief Sewell served as chief until he was unlawfully terminated on July 1, 2015.

20.     Lieutenant Green joined the Pocomoke City Police Department on or about November 13, 2011, as an officer, after serving for ten years with the Baltimore City Police Department.  He was promoted to first sergeant on December 6, 2011, and was promoted to lieutenant and operations manager on February 29, 2012.  After supporting Officer Savage in the latter's EEOC complaint, Lieutenant Green had his pay and terms of employment adversely altered in retaliation for that support.  On March 1, 2016, Lieutenant Green resigned from the Pocomoke City Police Department because of life threatening health conditions caused by the hostile environment and continued retaliation he experienced.

## DEFENDANTS[1]

21.     Pocomoke City is a municipality in Worcester County, Maryland, and is incorporated under Maryland law.  Pocomoke City has the capacity under Maryland law to sue and be sued.  Pocomoke City controls, and is ultimately responsible for, the actions and omissions of the Pocomoke City Police Department.  Pocomoke City is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, and a covered employer within the meaning of the Fair Labor Standards Act and Title VII.  Pocomoke City employs at least fifteen employees and is the proper Defendant under Title VII for wrongdoing by and against employees of the Pocomoke City Police Department.

22.     The County Commissioners of Worcester County is the governing body for the Worcester County and the Worcester County Sheriff's Office.  The County Commissioners of Worcester County, on behalf of Worcester County, have the capacity under Maryland law to sue and be sued.  The County Commissioners of Worcester County is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, subject to liability for violations of the First and Fourteenth Amendments to the United States Constitution.  The County Commissioners of Worcester County, along with the State of Maryland and Sheriff Reggie T. Mason, is one of the proper Defendants for claims brought under Title VII for wrongdoing by employees of the Worcester County's Sheriff's Office and by members of the CET.  Worcester County employs at least fifteen employees.

23.     The State of Maryland is the governmental entity that maintains the Worcester

---

[1] Beau Oglesby was named as a Defendant in the First Amended Complaint but was dismissed on August 19, 2016 solely on the basis of having absolute prosecutorial immunity.  *See* ECF No. 72, memorandum to counsel.  As a result, he was removed from the Second Amended Complaint.  Plaintiffs are appealing his dismissal, and in the event of a successful appeal, would reinstate previous claims against Oglesby.

County State's Attorney's Office, and is the proper Defendant for claims brought under Title VII for wrongdoing by employees of the Worcester County State's Attorney's Office.  The State of Maryland, along with the County Commissioners of Worcester County and Sheriff Reggie T. Mason, is one of the proper Defendants for claims brought under Title VII for wrongdoing by persons assigned to the Worcester County Sheriff's Office and the CET because certain claims against the county sheriffs in Maryland are considered claims against the State.  The State of Maryland employs at least fifteen employees.

24.     Reggie T. Mason is the current sheriff of Worcester County.  Mason, in his official capacity and in conjunction with the County Commissioners of Worcester County, controls, and is ultimately responsible for, the actions and omissions of the Worcester County Sheriff's Office and the CET.  In his official capacity, he is a proper defendant, along with the County Commissioners of Worcester County and the State of Maryland, for claims brought under Title VII for wrongdoing by persons assigned to the Worcester County Sheriff's Office and the CET.  During all times mentioned in this Complaint, Mason acted under the color of Maryland law.

25.     Russell Blake is the former City Manager of Pocomoke City.  Blake served as City Manager of Pocomoke City for 40 years—from 1975 to 2015.  He resigned as City Manager the day before Chief Sewell was terminated.  During all times mentioned in this Complaint, Blake acted under the color of Maryland law.  He is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, subject to liability for violations of the First and Fourteenth Amendments to the U.S. Constitution and the Fair Labor Standards Act.  Blake is sued in his individual capacity only.

26.     Ernie Crofoot is the current city manager of Pocomoke City.  During all times

mentioned in this Complaint, Crofoot acted under the color of Maryland law. He is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, subject to liability for violations of the First and Fourteenth Amendments to the U.S. Constitution. Crofoot is sued individually and in his official capacity as city manager.

27.     Bruce Morrison is the mayor of Pocomoke City. During all times mentioned in this Complaint, Morrison acted under the color of Maryland law. He is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985 and a covered employer under the Fair Labor Standards Act. Morrison is sued individually and in his official capacity as mayor.

28.     Nathaniel Passwaters is a sergeant in the Worcester County Sheriff's Office. He was one of two supervisors of the CET. Passwaters' responsibilities included direct supervision of Officer Savage and the other CET members. During all times mentioned in this Complaint, Passwaters acted under the color of Maryland law. He is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, subject to liability for violations of the First and Fourteenth Amendments to the United States Constitution. Passwaters is sued in his individual capacity only.

29.     Brooks Phillips is a corporal in the Department of Maryland State Police. He was a member of the CET on which Officer Savage served. During all times mentioned in this Complaint, Phillips acted under the color of Maryland law. He is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and 1985, subject to liability for violations of the First and Fourteenth Amendments to the United States Constitutions. Phillips is sued individually and in his official capacity as a Department of Maryland State Police trooper.

30.     Dale Smack, the only African American named as a Defendant in this Complaint, was the Chief Deputy Sheriff of the Worcester County Sheriff's Office during much of the

period covered in this Complaint.  During times pertinent to this Complaint, Smack acted under

the color of Maryland law.  He is a "person" within the meaning of 42 U.S.C. §§ 1981, 1983, and

1985, subject to liability for violations of the First and Fourteenth Amendments to the United

States Constitutions.  Smack is sued in his individual capacity only.

31.     Rodney Wells is a Corporal in the Worcester County Sheriff's Office.  He was a

member of the CET on which Officer Savage served.  During all times mentioned in this

Complaint, Wells acted under the color of Maryland law.  He is a "person" within the meaning

of 42 U.S.C. §§ 1981, 1983, and 1985, subject to liability for violations of the First and

Fourteenth Amendments to the United States Constitutions.  Wells is sued in his individual

capacity only.

32.     Patricia Donaldson is a Sergeant in the Department of the Maryland State Police.

Donaldson was the other supervisor of the CET, and thus also supervised Officer Savage, along

with Defendant Passwaters.  Donaldson knew of and condoned some of the wrongful acts and

omissions described in this Complaint.  Donaldson took no action as a supervisor on the CET to

end the discrimination against Officer Savage or to discipline or punish the offenders, thus

allowing it to continue unabated.  During all times mentioned in this Complaint, Donaldson acted

under the color of Maryland law.  She is a "person" within the meaning of 42 U.S.C. §§ 1981,

1983, and 1985, subject to liability for violations of the First and Fourteenth Amendments to the

United States Constitutions.  Donaldson is sued in her official and individual capacities.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

33.     In early June, 2014, Officer Savage attempted to file charges of discrimination

against the Worcester County Sheriff's Office and the CET but was turned away by the EEOC.

He was told he had to first make a report to the Pocomoke City Police Department.

34.      On July 21, 2014, Officer Savage filed a charge of discrimination against the Worcester County Sheriff's Office with the Maryland Commission on Civil Rights and cross-filed with the EEOC. He filed additional amended charges on October 28, 2014, and June 1, 2015. The EEOC took on investigation of the charges.

35.      On October 15, 2014, Officer Savage filed a charge of discrimination against the Pocomoke City Police Department with the EEOC. He filed additional amended charges on October 28, 2014, June 22, 2015, October 19, 2015, and December 14, 2015.

36.      On June 22, 2015, Officer Savage filed a charge of discrimination against the Worcester County State's Attorney's Office with the EEOC. He filed additional amended charges on October 19, 2015 and December 14, 2015.

37.      On March 9, 2015, Chief Sewell filed a charge of discrimination against the Pocomoke City Police Department with the EEOC. He filed an amended charge on June 15, 2015. On June 14, 2015, Chief Sewell filed a separate charge of discrimination against the Pocomoke City Police Department with the EEOC.

38.      On March 30, 2015, Lieutenant Green filed a charge of discrimination against the Pocomoke City Police Department with the EEOC. He filed an amended charge on June 10, 2015.

39.      On April 29, 2016, the EEOC issued probable cause findings for each of the Plaintiffs. *See* Exhibit A.

40.      First, the EEOC found that there was reasonable cause that Officer Savage was "subjected to harassment and unequal terms and conditions of employment and discharged in retaliation to protected activity" by the Pocomoke City Police Department.

41.      Second, the EEOC found that there was reasonable cause that the Worcester

14

County Sheriff's Office "exercised significant control over [his] employment such that it was a joint-employer" and that there was reasonable cause that Officer Savage was "harassed and subjected to a hostile work environment on the basis of his race in retaliation for engaging in protected activity."

42.     Third, the EEOC found that there was reasonable cause that the Worcester County State's Attorney's Office subjected Officer Savage to "harassment in retaliation for protected activity when Respondent engaged in third-party interference."

43.      Fourth, the EEOC found that there was reasonable cause that Pocomoke City terminated Chief Sewell in retaliation for his protected activity.

44.     Fifth, the EEOC found that there was reasonable cause that Pocomoke City subjected Lieutenant Green to harassment as a result of his protected activity.

45.     On August 29, 2016, Plaintiffs requested notices of rights to bring suit from the U.S. Department of Justice.

## FACTUAL ALLEGATIONS

### *About Pocomoke City*

46.     Once a major shipping town along the Pocomoke River, Pocomoke City sits in the southwest corner of Worcester County, Maryland's easternmost county.  The nearest town of any size, Salisbury, is a half-hour to the north; Ocean City is forty-five minutes to the northeast.  By car, Pocomoke City is slightly closer to Norfolk than Annapolis.  In between these cities and Pocomoke City, and in every other direction, are miles of farm fields and hunting grounds.

47.     Pocomoke City and the surrounding area have an unfortunate past with respect to race relations.  The area was slaveholding and lies south of the Mason-Dixon Line.  The City remains highly residentially segregated.  Almost half of the population is African American.

Historically, the government of the City has been entirely White.

48.     Pocomoke City is governed by its mayor, city manager, and city council.

49.     The office of mayor is an elected position.  The mayor must be a resident of and registered voter in Pocomoke City.  The mayor holds his or her office for a three-year term.  In this role, the mayor presides over the city council.  The Pocomoke City Charter states:  "The [m]ayor may take part in all [city council] discussions, but shall have no vote."  Pocomoke City Charter § C-8.

50.     The city council consists of five elected individuals who each must be a resident of Pocomoke City for at least one year prior to their election.  Each council member is elected to represent a single geographic district within the city's borders for a three-year term.[2]

51.     The city manager is appointed for an indefinite term by the city council.  While serving in this capacity, the city manager must be a resident of Pocomoke City.  The city manager "shall have power and shall be required to appoint and, when necessary for the good of the service, suspend or remove all officers and employees of the City."  Pocomoke City Charter § C-23. The city manager may hire and fire Pocomoke City employees, including police officers. Ultimately, the city manager is responsible for "the proper administration" of Pocomoke City. *Id.*

52.     According to 2010 Census data, just over 45 percent of Pocomoke City's 4,000 residents identify as Black or African American, and just fewer than 50 percent of its residents identify as White.

---

[2] The City's election system was changed from an at-large system to a districted system as a result of successful voting rights litigation brought by African American residents in the mid-1980s, challenging the at-large system and the City's all-white government as racially discriminatory.

53.     Despite these demographics, Pocomoke City is managed almost entirely by its White citizens.  The mayor, Morrison, is White.  Blake, the city manager for forty years, is White.  Crofoot, Blake's replacement, is White.  All members of the city council are White, except for one, Diane Downing.[3]

### About the Pocomoke City Police Department

54.     The Pocomoke City Police Department is an agency of the Pocomoke City government, consisting of up to 16 law-enforcement officers.  The officers are ranked from the entry-level rank of patrolman through chief of police.  The chief of police leads the department. Two lieutenants report to the chief; one lieutenant manages the operations of officers while the other manages administrative matters.

55.     The chief reports to both the mayor and the city manager.  Under this arrangement, Chief Sewell reported to both Morrison and Blake while leading the department.

56.     As city manager, however, Blake had final authority and acted as if it was solely within his power to make personnel decisions for the Pocomoke City Police Department.

57.     On several occasions, Chief Sewell submitted his annual budget, which included suggested salaries for the police department employees, to Blake, who should have then reviewed the budget and submitted it to the city council.  Instead, Blake completely disregarded Chief Sewell's budget and submitted a single, handwritten sheet of paper setting forth Blake's own suggested compensation amounts for the police department employees.

58.     In October 2011, Blake informed Chief Sewell that his salary would not be adjusted for his promotion to captain.

---

[3] In the spring of 2015, the City installed Dale Trotter, a White male, to represent District 4, a majority African American district, through an unlawful cancellation of the election and blocking of Sheila Palmer's (an African American woman) candidacy for the District 4 Council Seat.

59.     Despite Pocomoke City's significantly improved crime statistics during Chief Sewell's tenure, he did not receive annual raises, compensatory time, or paid health insurance, as other White chiefs had in the past.

60.     On information and belief, the chief of police prior to Chief Sewell received a raise each year he served as chief.  Chief Sewell received his first and only pay raise when he was promoted to chief on December 1, 2011.  Pocomoke City, acting through Blake, also declined to enter into an employment contract with Chief Sewell when he assumed his role as chief.  On information and belief, past White Pocomoke City police chiefs received employment contracts defining benefits and terms of severance, including severance pay.

61.     Chief Sewell observed that African American officers within the Pocomoke City Police Department were generally underpaid.  None of the African American officers received the pay raises he requested.

62.      From the time of Chief Sewell's promotion to chief through his termination, neither Lieutenant Green nor Officer Savage received pay raises.

63.     On more than one occasion, Chief Sewell recommended pay raises for Lieutenant Green and Officer Savage at the same time as other White officers.

64.     On information and belief, other White police officers of similar rank and performance to Lieutenant Green and Officer Savage received pay raises during the same period.

65.     Pocomoke City, acting through Blake, provided no explanation for denying Chief Sewell's recommendation regarding raises for African American officers while simultaneously granting raises to White officers.

***About the Worcester County Criminal Enforcement Team***

66.     In February 2012, Officer Savage was assigned to the CET as a narcotics investigator.  The CET is a multijurisdictional drug enforcement unit led by the Worcester County Sheriff's Office.  Most CET members are members of the Worcester County Sheriff's Office, but other Maryland law enforcement agencies, including the Department of Maryland State Police and the Ocean City Police Department, regularly detail officers for set periods of time.

67.     The duties of CET members are akin to the duties of a deputy employed by the Worcester County Sheriff's Office.

68.     At the time Officer Savage began working with the CET, it was housed in the same building as the Worcester County Sheriff's Office.

69.     In or about June 2012, the CET moved from the Worcester County Sheriff's Office to its own separate, off-site location within Worcester County.

70.     The vehicles and other equipment for surveillance and arrest were provided to CET members by the Department of Maryland State Police and the Worcester County Sheriff's Office.

71.     The Department of Maryland State Police and the Worcester County Sheriff's Office also each designated one member from each unit to serve as supervisors of the CET.

72.     Upon information and belief, these supervisors were delegated policymaking authority to determine the duties and priorities of the CET, set personnel policies within the CET, and supervise the use of technology and use of CET equipment.

73.     By both action and omission, the CET supervisors also established customs and practices within the CET.

19

74.     At the time Officer Savage was a member of the CET, the other six members of the CET were all White males, with the exception of Donaldson, a White female.

75.     The members of the CET included the following Defendants:  Passwaters, Donaldson, Phillips, and Wells.  The members also included Jeff Johns and Brian Trader.

76.     The CET was supervised by Passwaters and Donaldson.  They were Officer Savage's immediate supervisors.

77.     As the CET's supervisors, Passwaters and Donaldson were required to report misconduct by any CET member to that member's parent agency.  The parent agency has the authority to discipline its detailed CET members.

78.     Passwaters and Donaldson also determined Officer Savage's duties during his time on the CET and were responsible for preparing his employment evaluation and forwarding that report to Chief Sewell.  That evaluation could affect Officer Savage's rank, pay, and future prospects within the Pocomoke City Police Department.  The EEOC found, based on these facts, that Worcester County was a joint employer of Plaintiff Savage during the time he was assigned to the CET.  Exhibits A-1.

***The Worcester County Criminal Enforcement Team's Racially Hostile Work Environment***

79.     Shortly after Officer Savage's appointment to the CET in or around May 2012, after the CET relocated to its new office, the other six CET members began discriminating against Officer Savage because of his race.

80.     Phillips and Passwaters regularly referred to African Americans as "niggers" in Officer Savage's presence.  They repeatedly used the word in a sarcastic or demeaning tone to Officer Savage both orally and in written communications.  Savage would also hear Phillips and Passwaters refer to African American suspects as "niggers" or variations thereof.

81.     Beginning in 2012, once or twice a week, Wells streamed racially-charged videos that used the word "nigger" on his official work computer.  Members of the CET crowded around Wells' computer, watching and laughing about these videos.  Officer Savage observed this behavior because his assigned desk was located next to Wells' assigned desk.

82.     In or around September 2012, Wells asked Officer Savage why African Americans are offended when a White person uses the word "nigger" and its variants.  Wells then asked Officer Savage how he would personally feel if he called him a "nigger."  Officer Savage indicated that he would be offended.

83.     On September 16, 2012, Wells and Passwaters arrested an African American man for drug possession.  The suspect used the word "nigger" and its variants several times during the arrest.  After viewing the dash camera footage of the arrest, Passwaters played and replayed the footage in front of the entire CET because he thought the footage was funny.  During this incident, Passwaters informed members of the CET that "he [was] about to drop the n-bomb," referring to the word "nigger."  After Passwaters gave this "warning," he, himself, proceeded to say the word.

84.     On occasion, Passwaters also referred to African Americans as "ninjas."  Inside the CET, "ninja" was a known synonym for "nigger" based on a statement made during a previous investigation.

85.     In December 2012, Passwaters, Trader, and Wells repeatedly spoke to Officer Savage about lynchings and the Ku Klux Klan.

86.     On one occasion, Phillips, Trader, Wells, and Donaldson took Officer Savage to what the Defendants referred to as "KKK Lane" in Stockton, Maryland in Officer Savage's official covert vehicle provided by the Worcester County Sheriff's Office.

21

87.     At that time, the CET had no official duties in Stockton.

88.     Wells and Trader told Officer Savage that he might see some Klan members or a noose in Stockton.

89.     On or about this same time, Wells told Officer Savage about a chest in his attic in which he kept "white sheets and nooses."

90.     Phillips later informed Passwaters, one of the CET's two supervisors, that he and others had taken Officer Savage to "KKK Lane."

91.     Passwaters merely responded with "OK."  Despite his authority to set personnel policies for the CET, Passwaters took no action.

92.     The racially discriminatory actions against Officer Savage were not limited to verbal slurs.

93.     On more than one occasion, other members of the CET drew a "circle of trust" on a CET bulletin board.

94.     On the board, every member of the CET except Officer Savage was placed inside the circle.  Officer Savage's was the only name placed outside the circle.

95.     At the outset of Savage's employment with the CET, Savage's name was placed just outside the circle of trust.  But as time went on, and racial hostility directed at him increased, his name moved further and further outside the circle, until finally it appeared next to an arrow pointing off the bulletin board.

96.     Because the "circle of trust" was displayed in a common area, each of the Defendant CET members viewed it, including the CET supervisors, but no one, including the two supervisors, did anything to prevent or remove the offensive display.

97.     On another occasion, a member of the CET snapped a photograph of Officer

Savage eating a slice of watermelon in the CET office.

98.     Despite full knowledge of the racially-charged history of caricatures and stereotypes related to African Americans eating watermelon, members of the CET posted this photograph in various places around the CET workspace and on CET equipment.

99.     For instance, the watermelon photograph was placed in CET case files.

100.     The watermelon photograph was sent to Officer Savage's email and to other members of the CET's email accounts.

101.     The watermelon photograph was uploaded by members of the CET to Officer Savage's workplace computer.

102.     In total, the watermelon photograph was posted, transmitted, or placed in case files by members of the CET, including the Defendants, on more than ten occasions.

103.     Defendants Donaldson, Passwaters, Phillips, and Wells were aware of the repeated use of the watermelon photograph.

104.     On information and belief, Donaldson, Passwaters, Phillips, and Wells participated in the transmittal and posting of the watermelon photograph and took no action to stop further posting.

105.     Defendants Donaldson, Passwaters, Phillips, and Wells were or should have been aware of the racially derogatory stereotype of African Americans eating watermelon which dates back to the time of emancipation of slaves.

106.     In fact, upon information and belief, at least some members of the CET distributed and transmitted the photograph precisely because of the racial stereotype.

107.     On December 17, 2013, Officer Savage found a bloody deer's tail on the windshield of his car, which was parked on a side street by the CET office.

23

108.    Officer Savage reported the incident to Passwaters.  Passwaters, as a supervisor who is responsible for investigating workplace conditions, went to Officer Savage's car to see the deer tail.

109.    Upon returning to the CET office, Passwaters asked the other CET members if they had any knowledge of the incident.  Immediately after Passwaters' inquiry, Phillips began laughing.

110.    Donaldson later sent Officer Savage a text message acknowledging that Phillips placed the bloody deer's tail on Officer Savage's car.  A true and correct copy of Donaldson's text message is attached as Exhibit B to this Complaint and incorporated by reference as if fully set forth herein.

111.    On information and belief, neither Passwaters nor Donaldson took any action to discipline or punish Phillips for his involvement in the bloody deer tail incident.

112.    Following the bloody deer's tail incident, Officer Savage felt that he could not report the ongoing harassment to Passwaters and Donaldson, his CET supervisors, because Passwaters was actively involved in the harassment and both Passwaters and Donaldson had indicated by their previous inaction that they would not do anything to halt the discriminatory behavior.

113.    Officer Savage was also hesitant to report the harassment outside of the CET because he feared retaliation from City Manager Blake, Councilmember Dale Trotter, and Worcester County State's Attorney Oglesby—powerful figures in the Eastern Shore community who had authority over his employment conditions and who later would become aligned against him.

114.    In April 2014, Officer Savage found in his desk drawer a food stamp on which an

image of President Obama had been imposed, which Officer Savage took to be ridiculing

African Americans.  A true and correct copy of the altered food stamp placed in Officer Savage's

desk drawer is attached as Exhibit C to this Complaint and incorporated by reference as if fully

set forth herein.  On information and belief, only Officer Savage, and none of the other CET

members, received such a food stamp.

115.    Officer Savage verbally reported the altered food stamp incident to Chief Sewell

at or around the time of its occurrence in April 2014.

116.    On May 31, 2014, Phillips sent Officer Savage a text that read: "What's ya body

count nigga?  I'm in double digits."  A true and correct copy of Phillips' text message is attached

as Exhibit D to this Complaint and incorporated by reference as if fully set forth herein.

117.    Chief Sewell wrote a letter to Colonel Marcus L. Brown, the then-Secretary of the

Department of Maryland State Police, regarding the May 31 incident.

118.    After Savage began reporting the racial harassment outside of the CET's chain of

command, Passwaters and Phillips began to spread false rumors about Officer Savage that made

it impossible for Officer Savage to perform his job, first in the CET and then at the Pocomoke

City Police Department.

119.    On June 3, 2014, Passwaters accused Officer Savage of repeated tardiness and

alleged that Officer Savage's debt collectors and "wife" were repeatedly calling the Worcester

County Sheriff's Office.  Officer Savage has never been married and these calls never occured.

Passwaters had no documents or other support for these allegations.

120.    On or about June 3, 2014, at the CET's briefing prior to an undercover controlled

substance purchase, Passwaters asked Officer Savage if he was on drugs.

121.    During that purchase, Phillips burned some of the marijuana—one of the

25

substances obtained by the CET during the purchase.  When an Ocean City Police Department officer with whom the CET was working commented on the smell in the police vehicle, Phillips told the officer that Officer Savage had been smoking the marijuana.  Photographs of the marijuana and pipe that Phillips used are attached as Exhibit E to this Complaint and incorporated by reference as if fully set forth herein.

122.    The next day, on June 4, 2014, Officer Savage informed Chief Sewell that Passwaters asked Officer Savage if he was on drugs.  Chief Sewell then instructed Officer Savage to undergo a drug screening, in order to disprove this false allegation.

123.    On June 6, 2014, Officer Savage underwent the drug screening ordered by Chief Sewell.  The test results were negative for any unlawful substance, including marijuana.

124.    The racially-hostile environment and the use of the word "nigger" orally and in written form aimed at Officer Savage or in Officer Savage's presence continued through the remainder of his service on the CET.

125.    Officer Savage was insulted and offended by the CET's racially-hostile work environment.

126.    Officer Savage was further offended by the participation of his supervisors, their ratification of the racial epithets and racially discriminatory conduct, and their failure to intervene to stop the conduct or recommend discipline.

127.    Officer Savage was also physically and psychologically harmed by the racially-hostile work environment created by the CET.

128.    As a member of the CET, Officer Savage had consistently received positive performance reviews from his supervisors prior to his complaints about the race discrimination he encountered there.

129.    For example, on September 20, 2013, in Officer Savage's annual employee performance evaluation, Passwaters wrote that Officer Savage is "reliable" and "very trustworthy with sensitive information."

130.    Officer Savage's evaluations were forwarded by Donaldson and/or Passwaters to Chief Sewell, the Chief of Police of the Pocomoke City Police Department, who could use them to alter Officer Savage's conditions of employment, such as his continued detail to the CET, rank promotions, and raises.

131.    Irrespective of their overall treatment of Officer Savage, in or around April 2014, Officer Savage's colleagues and superiors wrote positive letters of recommendation on his behalf, supporting his applications to other police departments.  True and correct copies of some of these letters of recommendation are attached as Exhibit F to this Complaint and incorporated by reference as if fully set forth herein.

132.    Comparing this temporal juxtaposition of glowing reviews and recommendation letters in early 2014 with condemnation and derogatory comments against Officer Savage in the fall of 2014 demonstrates the retaliatory and racially discriminatory nature of the negative letters and reviews against Officer Savage.

133.    Based on these facts, the EEOC found reasonable cause to believe that Officer Savage "was harassed and subjected to a hostile work environment on the basis of his race and in retaliation for engaging in protected activity."  Exhibit A-1.

***Racially Offensive Conduct by the State's Attorney for Worcester County***

134.    State's Attorney Beau Oglesby leads the office that is solely responsible for prosecuting the cases investigated by the Pocomoke City Police Department and the cases brought by the CET within its jurisdiction.  In this capacity, Oglesby frequently interacted with

27

all three of the Plaintiffs and made decisions on which of their cases he would prosecute.

135.    On April 7, 2014, during a meeting with Officer Savage, Passwaters, and Assistant State's Attorneys Kelly Hurley and Ajene Turnbull, Oglesby read a series of letters written by a suspect, placing particular emphasis on and repeatedly saying the word "nigga."

136.    Mid-way through reading the letters, Oglesby paused and asked whether anyone in the room was offended.  At that moment, Assistant State's Attorney Turnbull, the only African American present other than Officer Savage, left the room.

137.    Oglesby then continued reading the letters aloud, and continued saying "nigga."

138.    Ultimately, Oglesby read the word "nigga" in the letters to the assembled prosecutors and police officers more than ten times.  True and correct copies of the letters Oglesby read from during this incident on April 7, 2014 are attached to this Complaint as Exhibit G and incorporated by reference as if fully set forth herein.

139.    Oglesby's reading of the word "nigga" in the letters and his use of the word were unnecessary and irrelevant to the prosecution of the case in connection with which the letters were obtained.

*Savage Resigns from the Worcester County Criminal Enforcement Team and Complains about His Treatment; Retaliation Begins*

140.    On June 12, 2014, Officer Savage resigned from the CET, citing the repeated use of the word "nigger" and variations thereof by his superiors and colleagues and a hostile work environment.

141.    Upon Officer Savage's resignation from the CET, CET members began spreading false and defamatory rumors about Officer Savage's honor and integrity with increasing frequency, which threatened his ability to perform his job.

142.   CET members, and the officials in Pocomoke City and the Worcester County Sheriff's Office who were the recipients of the rumors, knew or should have known that these rumors were without foundation and a manifestation and perpetuation of the overt racial discrimination to which Officer Savage had been subjected while serving on the CET.

143.   On June 23, 2014, Bernard B. Foster, the then-Chief of Staff for the Office of the Superintendent in the Maryland State Police, responded to Chief Sewell's May 31, 2014 letter concerning the bloody deer tail incident, stating that the letter was received and that Detective Sergeant Kelly Austin was assigned to this administrative investigation.

144.   Later, in a letter addressed to Officer Savage, Lieutenant M. B. Daugherty of the Criminal Enforcement Division of the Maryland State Police wrote that Detective Sergeant Kelly concluded that Phillips "violated the rules and regulations of the Maryland State Police with Unbecoming Conduct."  A true and correct copy of Lieutenant Daugherty's letter is attached as Exhibit H to this Complaint and incorporated by reference as if fully set forth herein.

145.   On information and belief, despite acknowledging that Officer Savage's allegations against Phillips were well-founded, the Department of Maryland State Police has taken no disciplinary action of any kind against Phillips to redress the wrong to Officer Savage.

146.   On July 15, 2014, Passwaters spread a false rumor to Morrison and Blake that Officer Savage used the false identification that he had been issued for undercover work to secure multiple fraudulent loans.

147.   Despite knowledge of past discriminatory conduct on the CET and with no evidence to substantiate Passwaters' allegations, Blake demanded that Chief Sewell investigate this allegation.

148.   Officer Savage returned the false identification to Chief Sewell.  The allegation

29

that Officer Savage had misused the undercover identification document(s) was false and was designed to injure Officer Savage's credibility and reputation.

149.     Around this same time, in mid-July 2014, Officer Savage noticed that he was no longer listed as a "detective" in the Pocomoke City employee database, which he took as a form of public humiliation and as falsely suggesting that he had been demoted.

150.     As a result of past overt racial harassment and its perpetuation through false rumors, on July 21, 2014, Officer Savage filed a complaint against the Worcester County Sheriff's Office with the EEOC.

151.     On July 22, 2014, Officer Savage filed a complaint against Oglesby with the Maryland Attorney Grievance Commission regarding the April 7, 2014 incident described in paragraphs 135 through 139, *supra*.  Officer Savage's complaint explained that he was "very offended" by Oglesby's repeated and gratuitous use of "the word Nigga so freely and without care in front of ASA Turnbull and [himself]."  The letter also noted a subsequent "difference in [Oglesby's] approach and actions towards" [sic] Officer Savage following the incident.

152.     Oglesby treated Officer Savage in a markedly different and less respectful manner both in and out of court after Officer Savage complained of Oglesby's racially discriminatory use of the word "nigga" on April 7, 2014.

153.     The complaint concluded by stating that Officer Savage "had problems sleeping as a result of constantly thinking of [Oglesby] reading the 'N' word over and over again in those letters and not taken [sic] actions in stopping this matter."  A true and correct copy of Officer Savage's complaint to the Maryland Attorney Grievance Commission is attached as Exhibit I to this Complaint and incorporated by reference as if fully set forth herein.

154.     Upon information and belief, Oglesby learned of the complaint a week after it was

filed.

155.     Following Officer Savage's reporting of the April 7, 2014 incident, Oglesby further treated Officer Savage differently.  Upon information and belief, the State's Attorney's Office no longer zealously prosecuted cases on which Officer Savage was the lead officer.

156.     This differential treatment of cases in which Officer Savage was involved was a mixture of retaliation for Officer Savage's reporting of racial harassment and continued racial harassment.

157.     Upon information and belief, by late July 2014, the highest officials who set policy for the Worcester County Sheriff's Office, the Maryland State Police, and the Pocomoke City Police Department, including Mason, Smack, and Blake, were aware of Officer Savage's allegations of racial hostility against Oglesby, Passwaters, and other members of the CET.

158.     In late July 2014, Passwaters continued his pattern of spreading false rumors about Officer Savage.

159.      At that time, Passwaters told Worcester County Sheriff's Office members that Officer Savage sold his off-duty weapon.

160.     To disprove this claim, Officer Savage brought the weapon to Chief Sewell, who took photographs of it.

161.     On July 29, 2014, one of Passwaters' superiors at the Worcester County Sheriff's Office, Smack, drafted a memorandum to Chief Sewell accusing Officer Savage of falsely representing himself to suspects as a member of the CET.  In the memorandum, Smack wrote to Chief Sewell that the CET would "not assist or participate in any investigative efforts set forth by Officer Savage."

162.     Chief Sewell spoke with Smack following receipt of the memorandum about its

31

contents.

163.     At the time he issued the memorandum, Smack knew or should have known about the racial harassment on the CET directed at Officer Savage.  Nonetheless, his letter and attitude toward Officer Savage relied upon unsubstantiated and false allegations from Passwaters and perpetuated the racial harassment from the CET by seeking to undermine Officer Savage's position with the Pocomoke City Police Department.

164.     Contrary to Smack's letter, Officer Savage did not identify himself as a member of the CET after his resignation from the CET.  This false allegation was designed and intended to injure Officer Savage's reputation and credibility in his charges of racial discrimination against Oglesby and the CET.

165.     On the very same day as Smack's letter, Blake also accepted at face value false rumors about Officer Savage—despite actual or constructive knowledge of the past racial discrimination against him on the CET—and told Chief Sewell that Officer Savage would no longer be called on to testify in court against suspects in Officer Savage's cases, including narcotics cases.

166.     Blake offered no performance-based explanation for his dictate.

167.     In a dangerous violation of his sworn duty, on August 14, 2014, Smack further told Chief Sewell that the Worcester County Sheriff's Office would not respond to any future emergency call or request for backup made by Officer Savage or Lieutenant Green.

168.     On at least two occasions, Officer Savage could not secure the assistance of a K-9 unit from the Worcester County Sheriff's Office.

169.     As a result of the retaliation and racial discrimination he was experiencing, on August 14, 2014, Officer Savage went on two weeks sick leave to deal with the stress caused by

the aforementioned actions of his colleagues and former colleagues on the CET, the Worcester

County Sheriff's Office, the Maryland State Police, and the Pocomoke City Police Department.

170.    While Officer Savage was on sick leave, on or about August 17, 2014, Blake

instructed Chief Sewell to take Officer Savage out of narcotics work altogether.  Blake pressured

Chief Sewell to assign Officer Savage to the undesirable midnight shift.  Blake also demanded

that Officer Savage be made a patrol officer, allowed only to confirm that downtown doors were

locked but forbidden from making any arrests.

171.    Throughout this period, Blake's actions continued to evidence racial

discrimination mixed with retaliation.  Blake instigated heated arguments through email

correspondence and verbal conversations with Chief Sewell over the treatment of Officer

Savage.  On one occasion, Blake referred to Chief Sewell as an "ungrateful ass nigger" during

the course of the disputes about the treatment of Savage and Green.

172.    After Officer Savage returned to work from his medical leave, Oglesby continued

to block Officer Savage from testifying because of Officer Savage's decision to report past

racially derogatory language.

173.    On September 4, 2014, Oglesby refused to acknowledge Officer Savage's

presence in court and talked past him to Lieutenant Green to say that Officer Savage's presence

would not be required to testify in a case that Officer Savage was handling.

174.    Oglesby's actions on September 4, 2014, were designed and intended to punish

and intimidate Officer Savage for his complaints of discrimination against Oglesby and other

Defendants.

175.    Less than a week later, Oglesby sent the Pocomoke City mayor and city council a

letter implying that he would not allow Officer Savage to testify in court because he

"question[ed] his veracity."

176.    On September 9, 2014, Chief Sewell was instructed by Blake to order Officer Savage to surrender the password to a work cell phone he used while with the CET.  Officer Savage was told that he would be disciplined by the Pocomoke City Police Department if he did not reveal the password.

177.    On or about September 11, 2014, Blake again instructed Chief Sewell to take Officer Savage out of narcotics work altogether and pressured Chief Sewell to assign Officer Savage to the midnight shift.

178.    On September 11, 2014, Officer Savage requested sick leave "until further notice" due to the "extreme stress and turmoil involving [his] current federal EEOC case and the recent letter from Oglesby, dated September 10, 2014."  As a result of Officer Savage's request, Blake required Chief Sewell to order Officer Savage to see a psychiatrist.  The psychiatrist cleared Officer Savage to return to active duty.

179.    On October 1, 2014, Officer Savage attended an EEOC mediation with Lieutenant Green, Smack, and Worcester County Lieutenant Michael McDermott ("McDermott").  Smack and McDermott attended the mediation on behalf of the Worcester County Sheriff's Office.  At the mediation, Smack and McDermott expressed open hostility toward Officer Savage and Lieutenant Green.

180.    At the mediation, Smack told Lieutenant Green that he and Officer Savage were the causes of Pocomoke City's problems.

181.    Smack and McDermott also denied any responsibility or liability, arguing that the Pocomoke City Police Department was responsible for any discrimination, as Officer Savage's principal employer, rather than the Worcester County Sheriff's Office (even though no member

34

of the CET other than Savage was employed by the Pocomoke City Police Department and the Pocomoke City Police Department had no control over the CET.).

182.    On October 13, 2014, Chief Sewell again ordered Officer Savage to see a psychiatrist "to be sure [that] the stress of [Officer Savage's] current situation does not diminish [his] fitness and effectiveness as an officer."

183.    On October 15, 2014, Officer Savage underwent a psychiatric evaluation.  The psychiatrist cleared Officer Savage to return to active duty.

184.    Chief Sewell protested many of Blake's orders to demote and otherwise penalize Officer Savage because he thought they constituted harassment, were the result of racial discrimination and retaliation, and did not have any performance basis.  On several occasions, Chief Sewell refused to fire Savage and Green, stating to Morrison, Blake, and other Defendants that Sewell and Green "were the victims" and that firing them would violate the law.

185.    On October 14, 2014, Chief Sewell was asked to testify before a meeting of the mayor, city manager, and entire city council.

186.    This meeting was a special meeting that included investigation of Blake's conduct, and no agenda or minutes are publicly available for the meeting.  It was not a typical meeting of the city council to discuss city business, where an agenda is posted online prior to the meeting and minutes are posted after the meeting.

187.    During that meeting, Chief Sewell raised concerns that Blake was retaliating against Officer Savage because Officer Savage had reported racial discrimination.

188.    Because Chief Sewell believed there was no performance-based rationale for penalizing Officer Savage, he testified that Blake was using his position of authority to harass and retaliate against Officer Savage for his EEOC charges.  Chief Sewell told the council that

Blake had ordered Chief Sewell to take disciplinary action against Officer Savage on a near daily basis.

189.    Blake became very upset during Chief Sewell's testimony and engaged in loud verbal arguments with Chief Sewell in front of the council.

190.    After the October 14, 2014, meeting, Blake continued to order adverse employment actions against Officer Savage, and Morrison also joined in several of these actions. To prevent this harassment, Chief Sewell had frequent conversations with members of the city council about Blake's misconduct and the need to refrain from punishing Officer Savage for his EEOC proceedings.

191.    These discussions with individual City Council members to prevent Blake from harassing Officer Savage and testimony before the specially convened council meeting investigating Blake's conduct were not part of Chief Sewell's daily responsibilities but were outside and beyond those duties.

192.    In mid-January 2015, Council member Trotter directed Chief Sewell to cap the allowable overtime for Officer Savage and Lieutenant Green.  Officer Savage and Lieutenant Green regularly worked more than forty hours per week.  Neither Officer Savage nor Lieutenant Green had the largest amount of overtime for any officer.  No White officer had his or her overtime similarly capped.

193.    On February 9, 2015, Officer Savage was officially demoted from his position as detective to patrol officer allegedly "due to a shortage of patrol officers."  Blake and Morrison ordered Chief Sewell to take this action.  A true and correct copy of the letter demoting Officer Savage is attached as Exhibit J to this Complaint and incorporated as if fully set forth herein.

194.    Rudell Brown, a junior officer trained by Officer Savage who had not filed a

complaint of discrimination, was promoted to detective immediately following Officer Savage's demotion.

195.    On March 9, 2015, Chief Sewell filed his own charge of discrimination with the EEOC alleging disparate treatment in employment terms against the Pocomoke City Police Department and the Worcester County Sheriff's Office.

196.    Three days later, on March 12, 2015, an anonymous letter was left on the windshield of Chief Sewell's car saying that the "niggers" Officer Savage, Lieutenant Green, and Chief Sewell will be gotten rid of.  The letter also referred to Chief Sewell as a "smart nigger chief."  A true and correct copy of this anonymous letter is attached as Exhibit K to this Complaint and incorporated as if fully set forth herein.

197.    On April 10, 2015, in a meeting with George Tasker, a member of the Pocomoke City Council, Chief Sewell explained that "Savage is the victim in his EEOC case and if [he] fire[s] him, [Savage] can sue [him], [Tasker], the Mayor and all the Council."

198.    Tasker replied that "Green is becoming a problem in [Sewell's] department to [sic] and once he and Savage is [sic] gone, that department well [sic] be okay."  Tasker also asked Chief Sewell whether he had heard what happened to Scott Keller, who was Chief of Police in Princess Anne County's Police Department before the Princess Anne Council voted him out of office on April 9, 2015.  This statement was intended to be a threat that Chief Sewell would be fired if he did not acquiesce to the retaliation against Savage and Green in their employment and employment conditions, including overtime, duties, and pay.

199.    On or about May 4, 2015, Officer Savage was informed by a citizen of Pocomoke City that Blake and Morrison were circulating a petition to remove Officer Savage and Lieutenant Green from the Pocomoke City Police Department.

200.     On June 15, 2015, Chief Sewell filed his First Amended Charge of Discrimination with the EEOC against the Pocomoke City Police Department and the Worcester County Sheriff's Office.

201.     Early in the morning on June 26, 2015, Lieutenant Green received an anonymous note in his mailbox warning that drugs had been planted on Green and Sewell, and that Worcester County officials were preparing search warrants to uncover those drugs.

202.     In the hostile atmosphere then surrounding the plaintiffs, Green took this threat very seriously and immediately contacted Chief Sewell about it.

203.     Like Green, Sewell was concerned about this threat, and took it very seriously. He decided that the best course would be to contact the Maryland State Police and ask that agency to bring a drug-detecting dog to do a preemptive search for any planted drugs.

204.     He promptly contacted Lieutenant Earl Starner, Maryland State Police's local barracks commander, explained the situation, and made this request.

205.     Much to Sewell's dismay, however, Starner informed Sewell that the Maryland State Police would not cooperate with the Pocomoke City Police Department, because Officer Savage had filed a discrimination complaint against one of its officers, referring to the internal affairs complaint, *even though that complaint reportedly was sustained by the Maryland State Police*.

206.     Thinking Starner must be mistaken, Sewell then contacted Maryland State Police Secretary William Pallozzi, again explained the situation, and made the same request.  Pallozzi, like Starner, refused to provide assistance, due to ill-will he cited between the two agencies. When Sewell asked Pallozzi what he suggested Sewell do, Pallozzi suggested Sewell contact the State Prosecutor's Office.

38

207.    Following the Maryland State Police rejection, Chief Sewell did as Pallozzi recommended and contacted the State Prosecutor's Office with his request for assistance to investigate the threat.  But an investigator at the State Prosecutor's Office said this was not the type of matter that office could assist with.  Ultimately, Chief Sewell was able to connect with another local police department to bring in a drug-detecting dog to search the Pocomoke City Police Department, as well as the homes and vehicles of Sewell and Green.  No drugs were found, suggesting that the threat might have been a hoax.

208.    On information and belief, Maryland State Police officials at the Berlin barracks subsequently told other local and state law enforcement officials that Chief Sewell had reported the threat to the Maryland State Police and requested assistance, and that MSP had refused to cooperate explicitly on grounds of the discrimination complaints that had been filed by Plaintiffs against Maryland State Police personnel.

209.    In so doing, Maryland State Police officials also took it upon themselves to perpetuate false and defamatory scuttlebutt denigrating the integrity of Chief Sewell, Lieutenant Green, and Officer Savage, even though they openly acknowledged that they had no actual evidence of any wrongdoing whatsoever by the three.

210.    On June 30, 2015, Blake resigned as city manager of Pocomoke City.

211.    Before Blake's resignation, Chief Sewell was asked to resign as chief of police, despite significant reductions in crime during his tenure and no complaints about his performance from Pocomoke City officials or citizens.  On July 1, 2015, Morrison issued a letter terminating Chief Sewell as chief of police.

212.    The city council voted 4 to 1 to terminate Chief Sewell, with the only African American member of the city council, Diane Downing, dissenting from the decision to terminate

Chief Sewell.

213.    Councilwoman Downing has repeatedly and publicly stated that the reasons given for the termination of Chief Sewell were entirely pretextual.

214.    Different city officials have given several different alleged reasons for the termination of Chief Sewell at different times.

215.    The firing of Chief Sewell was protested throughout Pocomoke City by both African American and White citizens because Chief Sewell had an excellent law enforcement record in Pocomoke City.

216.    On July 7, 2015, Lieutenant Earl Starner, the Berlin barracks commander and the same MSP official who on June 26 had refused assistance to Chief Sewell in retaliation for Savage's discrimination complaint, was appointed interim chief of the Pocomoke City Police Department.

217.    In August 2015, Crofoot became the City Manager and City Attorney of Pocomoke City.

218.    On August 17, 2015, Starner gave Officer Savage a letter stating that Officer Savage was being investigated by the Harford County Sheriff's Office for violating the Pocomoke City Police Department Code of Ethics because "[i]t is alleged that on July 22, 2015 [sic] you used the same language in a letter addressed to the Attorney Grievance Commission of Maryland.  This letter also contained the same misstated facts as mentioned above."  Officer Savage was required to sign this letter.

219.    This letter was in retaliation for Officer Savage's July 22, 2014 complaint—over a year earlier—to the Maryland Attorney Grievance Commission for Oglesby's use of the word "nigga" on April 7, 2014.

220.     On September 8, 2015, William Harden, Sr. was announced as the new chief of police of the Pocomoke City Police Department.

221.     On October 6, 2015, as required, Officer Savage attended an interrogation regarding the Harford County investigation.

222.     On or about October 16, 2015, Oglesby had a telephone conversation with Crofoot in which Oglesby was adamant that Officer Savage would never be able to testify again and was thus useless to the Pocomoke City Police Department.  On information and belief, Oglesby reiterated his view that Officer Savage should be terminated.

223.     On October 23, 2015, Paul Haskel, a Deputy State's Attorney in the Worcester County State's Attorney's Office, called the Pocomoke City Police Department advising that Officer Savage was not needed to testify in a trial in the Worcester County District Court.

224.     On October 26, 2015, Officer Savage was terminated from his position as an officer with the Pocomoke City Police Department.  Officer Savage was not afforded a right to a hearing or given any opportunity to appeal the decision.  Prior to his termination, Officer Savage's duties were limited to administrative tasks, such as reviewing and filing police reports. Immediately after Officer Savage was terminated, members of the CET began spreading rumors that Officer Savage was fired for using illegal narcotics.

225.     In firing Chief Sewell and Officer Savage, Pocomoke City, the Pocomoke City Police Department, the City Council, and Defendants Blake and Morrison did not follow required procedures, including those of the City Charter and the Maryland Law Enforcement Officers' Bill of Rights.

226.     Both Chief Sewell and Officer Savage were fired in retaliation for the exercise of their federal civil rights to be free from racial discrimination and retaliation under the United

41

States Constitution and laws of the United States.

227.     The retaliation against Chief Sewell did not end with his termination.

228.     After Chief Sewell's termination, Crofoot instructed the Pocomoke City Police Department to deny Chief Sewell's request for a letter that he left in good standing that was required by the Maryland State Police before it would authorize him to carry a handgun in future employment.

229.     In giving this instruction, Crofoot further retaliated against Chief Sewell for his protected activity.  This act of post-termination retaliation not only lacked legal justification, but it made it more difficult for Chief Sewell to find employment, to perform the requirements of his new employment, and to protect his own safety and that of his family.  In a law enforcement career spanning nearly 5,000 arrests—mostly in dangerous narcotics or homicide cases—Chief Sewell has received multiple death threats and has had contracts placed on his life from those whom he has arrested.  Crofoot's personal retaliation against Chief Sewell needlessly jeopardizes the safety of Chief Sewell and his family and continues to penalize him for his protected activity.

230.     On March 1, 2016, Lieutenant Green resigned from the Pocomoke City Police Department because of severe health conditions that developed as a result of his employment with the police department.

231.     Due to the pervasive environment of racial animus, both Officer Savage and Lieutenant Green had to take medical leave on several occasions to get away from the stressful environment.

232.     Officer Savage, Chief Sewell, and Lieutenant Green each were aware of and observed discriminatory acts against themselves and other African American police officers.

233.     As a result of Defendants' discriminatory conduct, Plaintiffs have suffered, and in

the future will continue to suffer, among other things, economic injury, humiliation, embarrassment, and mental and emotional distress.

234.    Throughout the time period alleged in this Complaint, the racially discriminatory acts of the Defendants were both collective in nature and intertwined, and were also designed and intended to retaliate against the Plaintiffs for assertion of their civil rights.

235.    On information and belief, other African American police officers serving on the Pocomoke City Police Department suffered racially discriminatory acts and a racially hostile work environment.

236.    On information and belief, active racial discrimination, a racially hostile work environment, and acts of retaliation for assertion of federal civil rights by African American police officers continue to the date of filing of this Second Amended Complaint.

237.    Based on these facts, the EEOC found reasonable cause to believe that the Worcester County Sheriff's Office, the Pocomoke City Police Department, Pocomoke City, and the Worcester County State's Attorney's Office had each retaliated against one or more of the Plaintiffs in response to protected activity.  Exhibit A-1 to A-7.

*Violations of Fair Labor Standards Act*

238.    Officer Savage regularly worked more than forty hours per week during his tenure with the Pocomoke City Police Department.

239.    Lieutenant Green regularly worked more than forty hours per week during his tenure with the Pocomoke City Police Department.

240.    Until approximately June 2014, Pocomoke City had a policy of not paying overtime unless the hours exceeded forty-three in one week.

241.    Upon learning of this policy, Chief Sewell expressed concern about its legality.

242.     In or around June 2014, Pocomoke City completed an audit of missed overtime wages between June 2011 and June 2014.  The audit revealed that both Officer Savage and Lieutenant Green were owed overtime wages.

243.     Blake falsely told the city council that Pocomoke City had fully compensated its employees for the three years' worth of missed overtime wages.

244.     In fact, neither Officer Savage nor Lieutenant Green received any compensation for their unpaid overtime wages.

245.     Defendants' failure to pay Officer Savage's and Lieutenant Green's full overtime wages, even after the audit had confirmed both the fact that Pocomoke City owed Officer Savage and Lieutenant Green overtime wages and the amount of such wages owed, constitutes willful, knowing, and intentional violations of Fair Labor Standards Act.

## CLAIMS FOR RELIEF

### COUNT I
### RACE DISCRIMINATION AND RETALIATION IN VIOLATION OF THE FOURTEENTH AMENDMENT AND 42 U.S.C. § 1983
### (Hostile Work Environment)
### (Savage v. Pocomoke City, Worcester County, Passwaters, Phillips, Wells, and Donaldson)

246.     Officer Savage alleges and incorporates each of the factual allegations stated in paragraphs 1 through 245 above.

247.     The Fourteenth Amendment to the United States Constitution guarantees citizens equal protection of the laws of the United States, with violations thereof giving rise to claims for relief under 42 U.S.C. § 1983.

248.     42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the United States Constitution and laws" by persons acting under the color of law.  The right to be free from racial discrimination in employment and retaliation for

44

assertion of one's civil rights were both clear and well-established rights, known to each of the

Defendants in this action throughout the time period of the allegations of this Complaint.

249.    Pocomoke City is a municipal corporation, and Pocomoke City Police

Department is an instrumentality of Pocomoke City.  Pocomoke City is liable under 42 U.S.C. §

1983 because a custom, practice, or policy of the municipality caused the violations of

Plaintiffs' constitutional rights, and/or because city officials with final policymaking authority

violated Plaintiffs' constitutional rights.  *See Monell v. Dep't of Social Servs.*, 436 U.S. 658

(1978).

250.    Worcester County controls the practices of the Worcester County Sheriff's Office.

As such, Worcester County is liable as Officer Savage's joint-employer.  *Butler v. Drive Auto.*

*Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015).  Specifically, during Officer Savage's

tenure on the CET, the Worcester County Sheriff's Office and Defendant Passwaters, a sergeant

with the Worcester County Sheriff's Office and one of the assigned supervisors of the CET,

exercised significant control over Officer Savage, supervised his day-to-day activities, and

furnished his equipment and place of work.

251.    By the acts and omissions described above, Defendants Pocomoke City,

Worcester County, Passwaters, Phillips, Wells, and Donaldson, acting under color of state law,

have maintained a pattern and practice of race discrimination and retaliation, creating a hostile

work environment.  Defendants used racial epithets directed toward or in the presence of Officer

Savage regularly.  The behavior by the above listed Defendants occurred when the Defendants

were acting within the scope of their employment and used incidents and tools of their

employment.

252.    Defendants' conduct was both severe and pervasive, especially given that the

racial epithets expressed by Passwaters, Phillips, and Wells were either spoken or condoned by

Officer Savage's supervisors, Defendants Donaldson and Passwaters.  That is, the hostile work

environment was caused or condoned by the CET, and by Defendants Donaldson and

Passwaters, the final policy making officials of the CET.  Officer Savage had a good faith and

reasonable basis to complain about race discrimination, constituting protected activity.

253.    Pursuant to their practices, Defendants have deprived Plaintiff of his rights to

equal protection of the law, in violation of the Fourteenth Amendment to the United States

Constitution, giving rise to his claims for relief under 42 U.S.C. § 1983.

254.    Defendants' discriminatory practice caused Officer Savage harm, including

severe emotional distress, medical bills, and lost wages and benefits.

## COUNT II
### RACE DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE VII
### (Hostile Work Environment)
### (Savage v. Pocomoke City, Worcester County, Sheriff Mason, & the State of Maryland)

255.    Officer Savage alleges and incorporates each of the factual allegations stated in

paragraphs 1 through 245 above.

256.    Title VII of the Civil Rights Act of 1964 makes it unlawful to alter the terms,

conditions, or privileges of employment on the basis of race or in retaliation for protected

activity.  42 U.S.C.§§ 2000e-2(a)(1) & 2000e-3(a).

257.    Pocomoke City, Worcester County, Worcester County Sheriff Mason, and the

State of Maryland constitute employers for purposes of Title VII.

258.    Worcester County and the State of Maryland each control different aspects of the

Worcester County Sheriff's Office and the CET.  As such, Worcester County and the State of

Maryland are liable for the unlawful acts of the employees of the Worcester County Sheriff's

Office and of the employees who were assigned to the CET.

259.    The above acts and omissions were committed by the employees of the Worcester County Sheriff's Office and the CET.  Because the Sheriff, County, and State (collectively, the "Worcester County Sheriff's Office" for purposes of this Count) are the legally responsible entities for the acts and/or omissions for the Sheriff's Office and the CET and constitute employers under Title VII, they are named as defendants in this count.

260.    The Worcester County Sheriff's Office, along with Pocomoke City, is liable under Title VII as Officer Savage's joint-employer.  *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015).  Specifically, during Officer Savage's tenure on the CET, the Worcester County Sheriff's Office—including Defendant Passwaters, a sergeant with the Worcester County Sheriff's Office and supervisor of the CET—exercised significant control over Officer Savage, supervised his day-to-day activities, created and implemented personnel policies, and furnished his equipment and place of work.

261.    Pocomoke City, as Savage's other joint-employer, had a duty to ensure that Officer Savage worked in an environment free of unlawful racial harassment and retaliation before, during, and after the time he was assigned to the CET.

262.    By the acts and omissions described above, employees of Pocomoke City and the Worcester County's Sheriff's Office have maintained a pattern and practice of race discrimination and retaliation, creating a hostile work environment.

263.    The unlawful behavior of the Pocomoke City officials and the employees of the CET, the Worcester County Sheriff's Office occurred when they were acting within the scope of their employment and used incidents and tools of their employment.

264.    Defendants' harassing conduct was both severe and pervasive such as to alter the

47

terms, conditions, and privileges of Officer Savage's employment, especially given, among other things, Defendants' employees' use of racial epithets directed toward or in the presence of Officer Savage regularly.

265.    Defendants' employees' also began a pattern of retaliation against Officer Savage after he opposed unlawful harassment during his time on the CET.

266.    This retaliation began while Officer Savage was assigned to the CET and continued after Officer Savage left the CET and returned to the Pocomoke City Police Department.  After he left the CET, its members further retaliated against Officer Savage by urging other government officials to join in the discrimination and retaliation.  As new leading officials in Pocomoke City's government and the Worcester County Sheriff's Office became aware of Officer Savage's decision to report unlawful harassment and retaliation, they joined in and perpetuated the acts of discrimination and retaliation.

267.    The harassing conduct was unwanted by Officer Savage.

268.    The employees of Pocomoke City, and the Worcester County Sheriff's Office engaged in the harassing conduct because of Officer Savage's race and protected activity.

269.    Officer Savage had a good faith and reasonable basis to complain about race discrimination, constituting protected activity

270.    Worcester County, the State of Maryland, the Worcester County Sheriff, and Pocomoke City had actual and constructive knowledge of the harassing behavior of their employees because Savage reported it to his superiors, because his superiors, including Passwaters, participated in and witnessed the harassment and did nothing to stop it, and because the highest county, state, and municipal officials were aware of the reports of discrimination. Worcester County, the State of Maryland, the Worcester County Sheriff, and Pocomoke City did

48

nothing to stop the harassing behavior.

271.    Pursuant to their practices, Pocomoke City, Worcester County, the Worcester

County Sheriff, and the State of Maryland violated Title VII.

272.    Defendants' discriminatory and retaliatory practices caused Officer Savage harm,

including severe emotional distress, medical bills, and lost wages and benefits.

**COUNT III**
**RACE DISCRIMINATION AND RETALIATION IN VIOLATION OF THE**
**FOURTEENTH AMENDMENT AND 42 U.S.C. § 1983**
**(Termination)**
**(Savage v. Pocomoke City and Blake)**
**(Sewell v. Pocomoke City and Morrison)**

273.    Plaintiffs allege and incorporate each of the factual allegations stated in

paragraphs 1 through 245 above.

274.    The Fourteenth Amendment to the United States Constitution guarantees citizens

equal protection of the laws of the United States, with violations thereof giving rise to claims for

relief under 42 U.S.C. § 1983.

275.    42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or

immunities secured by the United States Constitution and laws" by persons acting under the

color of law.  The right to be free from racial discrimination in employment and retaliation for

assertion of one's civil rights were both clear and well-established rights, known to each of the

Defendants in this action throughout the time period of the allegations of this Complaint.

276.    Pocomoke City is a municipal corporation, and Pocomoke City Police

Department is an instrumentality of Pocomoke City.  Pocomoke City is liable under 42 U.S.C.

§ 1983 because a custom, practice, or policy of the municipality caused the violations of

Plaintiffs' constitutional rights, and/or because city officials with final policymaking authority

violated Plaintiffs' constitutional rights. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

277.   Officer Savage had a good faith and reasonable basis to complain about race discrimination, constituting protected activity.

278.   Although he had a history of positive performance evaluations, Officer Savage was terminated from his position by the named Defendants on October 26, 2015.  This termination was motivated in whole or in part by Officer Savage's race and/or in retaliation for Officer Savage's protected activity of complaining about race discrimination.

279.   Despite Pocomoke City's improved crime statistics during Chief Sewell's tenure as the first African American Chief of Police for the Pocomoke City Police Department, Chief Sewell was terminated from his employment by the named Defendants on July 1, 2015.  This termination was motivated in whole or in part by Chief Sewell's race and by retaliation mixed with race-based discrimination and was an act of retaliation for Chief Sewell's protected activity.

280.   In carrying out these wrongful terminations, Defendants have deprived Officer Savage and Chief Sewell of their rights to equal protection of the law, in violation of the Fourteenth Amendment to the United States Constitution, giving rise to their claims for relief under 42 U.S.C. § 1983.

281.   Defendants' discriminatory practices have caused Officer Savage and Chief Sewell harm, including severe emotional distress, medical bills, and lost wages and benefits.

**COUNT IV**
**RACE DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE VII**
**(Termination)**
**(Savage v. Pocomoke City)**
**(Sewell v. Pocomoke City)**

282.    Plaintiffs allege and incorporate each of the factual allegations stated in paragraphs 1 through 245 above.

283.    Title VII makes it unlawful to discharge an employee on the basis of race or in retaliation for protected activity.  42 U.S.C.§§ 2000e-2(a)(1), 2000e-3(a).

284.    Pocomoke City constitutes an employer for purposes of Title VII.

285.    Officer Savage had a good faith and reasonable basis to complain about race discrimination, constituting protected activity.

286.    Chief Sewell had a good faith reasonable basis for his belief that the termination of Officer Savage's employment would violate Title VII.  Chief Sewell's refusal to terminate Officer Savage for impermissible reasons constituted protected activity.

287.    Although he had a history of positive performance evaluations, Officer Savage was terminated from his position by Pocomoke City on October 26, 2015.  This termination was motivated in whole or in part by Officer Savage's race and/or in retaliation for Officer Savage's protected activity of complaining about race discrimination.

288.    Officer Savage's termination was the final act of race discrimination and retaliation by Pocomoke City officials after many intermediate acts, such as demotion, loss of overtime, and loss of work privileges and responsibilities.

289.    Despite Pocomoke City's improved crime statistics during Chief Sewell's tenure as the first African American Chief of Police for the Pocomoke City Police Department, Chief

51

Sewell was terminated from his employment by Pocomoke City on July 1, 2015.  This

termination was motivated in whole or in part by Chief Sewell's race and/or in retaliation for his

protected activity.

290.    Pocomoke City continued to retaliate against Chief Sewell following his

termination by denying him a letter that would allow him to continue to engage in police work

and protect himself and his family.

291.    These unlawfully motivated terminations give cause to claims under Title VII, 42

U.S.C. §§ 2000e-2(a)(1), 2000e-3(a).

292.    Defendants' discriminatory practices have caused Officer Savage and Chief

Sewell harm, including severe emotional distress, medical bills, and lost wages and benefits.

<u>**COUNT V**</u>
**RACE DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE VII**
**(Disparate Treatment)**
**(Savage v. Pocomoke City, Worcester County, Sheriff Mason, and the State of Maryland)**

293.    Plaintiffs allege and incorporate each of the factual allegations stated in

paragraphs 1 through 245 above.

294.    Title VII makes it unlawful to alter the terms, conditions, and privileges of

employment on the basis of race or in retaliation for protected activity.  42 U.S.C. §§ 2000e-

2(a)(1), 2000e-3(a).

295.    Pocomoke City, Worcester County, the Worcester County Sheriff, and the State

of Maryland constitute employers for purposes of Title VII.  42 U.S.C. § 2000e(b).

296.    Worcester County, the Worcester County Sheriff, and the State of Maryland each

legally control certain practices and functions within the Worcester County Sheriff's Office and

the CET.  As such, Worcester County, the Worcester County Sheriff, and the State of Maryland

are liable for the unlawful acts of the employees of the Worcester County Sheriff's Office and of the CET.

297.    The acts and omissions were committed by the employees of the Worcester County Sheriff's Office and the CET.  Because the Sheriff, County, and State (collectively the "Worcester County Sheriff's Office" for purposes of this Count) are the legally responsible entities for the acts and/or omissions for the Sheriff's Office and the CET and constitute employers under Title VII, they are named as Defendants in this count.

298.    Specifically, during Officer Savage's tenure on the CET, the Worcester County Sheriff's Office and Defendant Passwaters—a sergeant with the Worcester County Sheriff's Office and one of the assigned supervisors of the CET—exercised significant control over Officer Savage, supervised his day-to-day activities, and furnished his equipment and place of work.

299.    The Worcester County Sheriff's Office, along with Pocomoke City, is liable under Title VII as Officer Savage's joint-employer.  *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015).

300.    The Worcester County Sheriff's Office is liable for violations of Title VII for unlawful actions or omissions that took place during the time that Officer Savage was assigned to the CET, and remains responsible for discriminatory and retaliatory conduct that continued after it no longer employed Officer Savage.

301.    Officer Savage had a good faith and reasonable basis to complain about race discrimination and file charges of discrimination with the EEOC, each of which constituted protected activity.

302.    Officer Savage faced disparate treatment from Pocomoke City and the Worcester

County's Sheriff's office.  This disparate treatment included, but is not limited to the following: he was demoted from the role of detective; he was investigated by the Harford County Sheriff's Office; he was prohibited from making arrests or testifying in court; he was assigned the midnight shift on foot patrol; his overtime was cut; false rumors were circulated about his veracity and alleged drug use; and the Worcester County's Sheriff's Office made the dangerous decision to stop responding to Officer Savage's calls for back up.  All of these actions were taken in unlawful retaliation for his EEOC complaints against the Defendants.

303.    The acts and omissions of Pocomoke City and the Worcester County Sheriff's Office were motivated in whole or in part by Officer Savage's race and in retaliation for Officer Savage's protected activity.

304.    These unlawfully motivated actions give rise to claims under Title VII, 42 U.S.C.§§ 2000e-2(a)(1), 2000e-3(a).

305.    Defendants' discriminatory practices have caused Officer Savage harm, including severe emotional distress, medical bills, and lost wages and benefits.

## COUNT VI
### RACE DISCRIMINATION AND RETALIATION IN VIOLATION OF THE FOURTEENTH AMENDMENT AND 42 U.S.C. § 1983
#### (Disparate Treatment:  Benefits and Pay)
#### (All Plaintiffs v. Pocomoke City and Blake)

306.    Plaintiffs allege and incorporate each of the factual allegations stated in paragraphs 1 through 245 above.

307.    The Fourteenth Amendment to the United States Constitution guarantees citizens equal protection of the laws of the United States, with violations thereof giving rise to claims for relief under 42 U.S.C. § 1983.

308.    42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or

immunities secured by the [United States] Constitution and laws" by persons acting under the color of law.  The right to be free from racial discrimination in employment and from retaliation for assertion of one's civil rights were both clear and well-established rights, known to each of the Defendants in this action throughout the time period of the allegations of this Complaint.

309.    Pocomoke City is a municipal corporation, and the Pocomoke City Police Department is an instrumentality of Pocomoke City.  Pocomoke City is liable under 42 U.S.C. § 1983 because a custom, practice, or policy of the municipality caused the violations of Plaintiffs' constitutional rights, and/or because city officials with final policymaking authority violated Plaintiffs' constitutional rights.  *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

310.    Officer Savage had a good faith and reasonable basis to complain about race discrimination, constituting protected activity.

311.    As Pocomoke City Manager for nearly forty years, Defendant Blake was the city official responsible for determining the benefits and salaries of the Pocomoke City Police Department, including each of the Plaintiffs' benefits and salaries.

312.    Despite satisfactory job performance, Chief Sewell received lower pay and fewer benefits than similarly situated White police chiefs who had previously held the same position. Unlike his predecessors, Chief Sewell did not receive regular salary increases, compensatory time, paid health insurance, or an employment contract.  As for Officer Savage and Lieutenant Green, they received lower pay than similarly situated White officers, and Chief Sewell's requests to raise their salaries were denied, despite similarly situated White officers receiving pay raises.  Subsequently, as a result of engaging in statutorily protected activity, they also experienced retaliation with regard to pay and benefits, resulting in demotion and still more

disparate benefits and pay, as detailed above.

313.    Pursuant to their practices, Defendants have deprived Plaintiffs of their rights to equal protection of the law, in violation of the Fourteenth Amendment to the United States Constitution, giving rise to their claims for relief under 42 U.S.C. § 1983.

314.    Defendants' discriminatory practices caused Plaintiffs harm, including severe emotional distress, medical bills, and lost wages and benefits.

### COUNT VII
### RACE DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE VII
**(Disparate Treatment:  Benefits and Pay)**
**(All Plaintiffs v. Pocomoke City)**

315.    Plaintiffs allege and incorporate each of the factual allegations stated in paragraphs 1 through 245 above.

316.    Title VII makes it unlawful to discriminate against any individual with respect to compensation, benefits, terms, conditions, or privileges of employment on the basis of race or in retaliation for protected activity.  42 U.S.C. §§ 2000e-2, 2000e-3.

317.    Pocomoke City constitutes an employer for purposes of Title VII.

318.    Plaintiffs had a good faith and reasonable basis to complain about race discrimination, constituting protected activity.

319.    Lieutenant Green's participation in Officer Savage's mediation constitutes protected activity.

320.    Despite satisfactory job performance, Chief Sewell received lower pay and fewer benefits than similarly situated White police chiefs who had previously held the same position. Unlike his predecessors, Chief Sewell did not receive regular salary increases, compensatory time, paid health insurance, or an employment contract.

321.     As for Officer Savage and Lieutenant Green, they received lower pay than similarly situated White officers, and Chief Sewell's requests to raise their salaries were denied, despite similarly situated White officers receiving pay raises.  As a result of engaging in statutorily protected activity, they also experienced retaliation with regard to pay and benefits, resulting in demotion and still more disparate benefits and pay, as detailed above.

322.     Pursuant to their practices, Pocomoke City violated Title VII, 42 U.S.C. §§ 2000e-2, 2000e-3.

323.     Defendants' discriminatory practices caused Plaintiffs harm, including severe emotional distress, medical bills, and lost wages and benefits.

<u>COUNT VIII</u>
**RACE DISCRIMINATION and RETALIATION IN VIOLATION OF THE
FIRST AMENDMENT AND 42 U.S.C. § 1983
(Free Speech and Right to Petition)
(Savage v. Blake, Passwaters, and Smack)**

324.     Officer Savage alleges and incorporates each of the factual allegations stated in paragraphs 1 through 245 above.

325.     The First Amendment to the United States Constitution guarantees the rights to freedom of speech on matters of public concern and to petition the government for redress of grievances, with violations thereof giving rise to claims for relief under 42 U.S.C. §1983.

326.     Officer Savage engaged in protected activity when he exercised his First Amendment rights to free speech on matters of public concern to the community and to petition the government for grievances when he complained of the April 7, 2014, incident to the Maryland Attorney Grievance Commission as detailed in paragraphs 151 through 153, *supra*.

327.     Officer Savage similarly exercised his First Amendment rights when he identified racial discrimination inside the CET in a July 21, 2014, EEOC complaint filed against the

Worcester County Sheriff's Office.

328.    In fact, several months prior to either complaint, Officer Savage's reports of racial discrimination inside the CET were made known to the highest officials in Pocomoke City and the Worcester County's Sheriff's Office and were indisputably a matter of public concern.

329.    In April 2014, Officer Savage reported racial discrimination outside the CET after the altered food stamp was left near his desk.  On May 31, 2014, he reported a second incident of a racially discriminatory text message, which Chief Sewell then described in a letter to the Department of Maryland State Police.  Finally, in his June 12, 2014, resignation letter, Savage raised the racial discrimination and hostility within the CET for a third time.

330.    Defendants Blake, Passwaters, and Smack were aware that Officer Savage had raised separate issues of racial discrimination in his April, May, and June 2014 reports.  On or before Officer Savage's June 2014 resignation letter, Defendant Smack was also aware of the racial discrimination Officer Savage had experienced within the CET.

331.    In taking the above actions, Officer Savage spoke out as a citizen of the community.

332.    Testifying at trial in criminal prosecutions was a vital part of Officer Savage's duties as a police officer and, in particular, as a member of the CET and of the Pocomoke City Police Department.

333.    Oglesby took the extraordinary step of writing a letter to Mayor Morrison, and the members of the City Council, falsely accusing Officer Savage of lying in his complaints of racial discrimination to the EEOC and the Maryland Attorney Grievance Commission against Oglesby.

334.    This action directly interfered with Plaintiff's ability to execute his job duties. Oglesby made this decision very soon after or on the exact day he was made aware of Officer

Savage's complaint of racial harassment against him.

335.    After learning of Officer Savage's April and May 2014 reports, Passwaters began to retaliate against Office Savage's reporting of racial discrimination.  Without any factual basis, Passwaters falsely accused Officer Savage of tardiness and using drugs and claimed that Officer Savage's debt collectors and "wife" were repeatedly calling the Worcester County Sheriff's Office.

336.    Passwaters acts of retaliation intensified after Officer Savage's June 2014 resignation letter.  Passwaters spread rumors to Defendants Blake and Smack that were untrue and which Blake and Smack knew or should have known were untrue based on Passwaters' prior participation in racial discrimination against Officer Savage on the CET.

337.    Despite the obvious retaliatory motive of Passwaters, Blake and Smack adopted Passwaters' rumors without investigation and engaged in their own acts of retaliation.  These retaliatory acts directly harmed Officer Savage in his employment with the Pocomoke City Police Department.

338.    Passwaters, Blake and Smack each retaliated against Officer Savage for reporting the racial discrimination within the CET.  Their acts of retaliation made it difficult or impossible for Officer Savage to fulfill his job responsibilities until such acts resulted in demotion and eventually termination.

339.    Blake demanded Chief Sewell investigate the meritless rumors of Passwaters. Thereafter, Blake told Chief Sewell that Officer Savage could not testify in criminal cases and ordered Chief Sewell to refer Officer Savage to a psychiatrist, remove Officer Savage from narcotics work and assign him to the midnight shift.  Each of these acts occurred as a result of Officer Savage's reporting of racial discrimination, and would not have happened but for those

reports.

340.    Blake's various retaliatory actions directly ordered adverse employment actions against Officer Savage.  Such actions will have a chilling effect on other public employees reporting racial harassment.

341.    For his part, Smack wrote a letter wrongly accusing Officer Savage of using false identification and stating that the Worcester County Sheriff's Office would not send any backup for Officer Savage.

342.    Smack's actions of refusing to provide Officer Savage with backup from the Worcester County Sheriff's Office and its K-9 unit writing a letter containing false allegations interfered with Officer Savage's duties as a police officer and, in particular, as an officer engaged in narcotics work, and will have a chilling effect on other employees filing grievances. Smack's actions were in retaliation for Officer Savage's reporting of racial discrimination within the CET that included members of the Worcester County Sheriff's Office.

343.    Pursuant to their practices, Defendants deprived Officer Savage of his rights under the First Amendment to the United States Constitution, giving rise to his claims for relief under 42 U.S.C. §1983.

344.    Defendants' practices caused Officer Savage harm, including severe emotional distress, medical bills, and lost wages and benefits.

**COUNT IX**
**RETALIATION IN VIOLATION OF TITLE VII**
**(Retaliatory Interference)**
**(Savage v. the State of Maryland)**

345.    Officer Savage alleges and incorporates each of the factual allegations stated in paragraphs 1 through 245 above.

346.    Title VII makes it unlawful to alter the terms, conditions, and privileges of employment in retaliation for protected activity.  42 U.S.C.§§ 2000e-2, 2000e-3.

347.    Pocomoke City constitutes Officer Savage's employer for purposes of Title VII. The State of Maryland is a covered employee under Title VII, and, therefore, cannot interfere with Officer Savage's covered employment relationship with Pocomoke City.

348.    The State of Maryland controls the practices of the Worcester County State's Attorney's Office.  As such, the State of Maryland is liable for the unlawful acts of the employees of the Worcester County State's Attorney's Office.

349.    Officer Savage's complaint of race discrimination to the Attorney Grievance Commission and his charges of discrimination with the EEOC constitute protected activity.

350.    Officer Savage had a good faith and reasonable basis to complain about race discrimination.

351.    Worcester County State's Attorney's Office's prohibition of Officer Savage testifying in court, its disparaging letters to members of the Pocomoke City Council about Officer Savage, and its efforts to influence Pocomoke City's demotion and termination of Officer Savage were because of his protected activity.

61

352.     Worcester County State's Attorney's Office interfered with the employment relationship that Officer Savage had with Pocomoke City.

353.     The State of Maryland thus committed retaliatory interference in violation of Title VII.

354.     Defendant's retaliatory practices following earlier discrimination and Officer Savage's reporting of it caused Officer Savage harm, including severe emotional distress, medical bills, and lost wages and benefits.

**COUNT X**
**RACE DISCRIMINATION AND RETALIATION IN VIOLATION OF THE**
**FIRST AMENDMENT AND 42 U.S.C. § 1983**
**(Free Speech)**
**(Sewell v. Pocomoke City, Blake, Morrison)**

355.     Chief Sewell alleges and incorporates each of the factual allegations stated in paragraphs 1 through 245 above.

356.     Defendant Blake repeatedly pressured Chief Sewell to take adverse employment actions and other disciplinary actions against Officer Savage from approximately July 15, 2014, until Chief Sewell was terminated on July 1, 2015.

357.     Chief Sewell protested many of these orders because, in his opinion, Blake's orders were in furtherance of the racial discrimination against Officer Savage and in retaliation for his having reported that discrimination.

358.     On October 14, 2014, Chief Sewell was called to testify in a special, closed meeting of the entire Pocomoke City Council, Morrison, and Blake.

359.     While testifying before the Pocomoke City Council, Chief Sewell informed members of the Council that Blake unlawfully and without factual basis had ordered Chief Sewell to demote Officer Savage and to take other adverse employment actions, and that

Blake's allegations about Sewell were a pretext to increase the pressure on Chief Sewell to take unlawful action against Officer Savage. Chief Sewell encouraged the City Council to investigate and to take action to prevent Blake's misconduct.

360. Following the October 14, 2014 meeting, Chief Sewell continued to raise concerns about misconduct by Blake to individual members of the city council. Chief Sewell was concerned that Officer Savage had been the victim of racial discrimination and that Blake's orders were an effort to conceal that discrimination and to retaliate against Officer Savage for filing an EEOC complaint.

361. Testifying before the Pocomoke City Council and expressing concerns to individual Council members who could investigate and prevent misconduct was speech that warrants First Amendment protection and was an act to inform the public of wrongdoing by Blake and others within City government.

362. Chief Sewell's meetings with individual council members and testimony before the special meeting of the Council were outside and beyond any daily professional duties that Chief Sewell had with respect to the Council and individual Council members.

363. When raising these concerns and urging Council members to prevent Blake's discrimination and retaliation, Chief Sewell acted in the role of a citizen.

364. Because Sewell raised allegations of misconduct against Blake to individual members of the council and during council meetings, Blake and Morrison made efforts to terminate Chief Sewell.

365. Chief Sewell was asked to resign in late June 2015.

366. On July 1, 2015, Chief Sewell was terminated by a letter from Morrison, who had final policymaking authority for Pocomoke City. This action, taken in retaliation for Sewell's

outspoken opposition to race discrimination and his refusal to condone discrimination against his subordinate employees, deprived Chief Sewell of his rights under the First Amendment to the United States Constitution.

367.    Pocomoke City, acting through Crofoot, continued to retaliate against Chief Sewell following his termination by denying him a letter that would allow him to continue to engage in police work and protect himself and his family.

368.   Defendants' practices caused Chief Sewell harm, including severe emotional distress, medical bills, and lost wages and benefits.

### COUNT XI
### CIVIL CONSPIRACY IN VIOLATION of 42 U.S.C. § 1985
### (Savage v. Blake, Crofoot, Passwaters, and Smack)

369.    Officer Savage alleges and incorporates each of the factual allegations stated in paragraphs 1 through 245 above.

370.    42 U.S.C. § 1985 prohibits conspiracies interfering with civil rights.

371.    Defendants Blake, Crofoot, Passwaters, and/or Smack engaged in a conspiracy and unlawful agreement to deprive Officer Savage of his constitutional and statutorily protected right to work in an environment free of racial harassment and his right not to suffer adverse employment actions on the basis of his race.  This conspiracy was motivated by animus with respect to Officer Savage's race.

372.    The purpose of the conspiracy was to discredit Officer Savage's valid complaints of racial discrimination and retaliation in violation of his federal civil rights.  The purpose of the conspiracy was also to obtain Officer Savage's termination from the Pocomoke City Police Department on a pretextual basis, knowing that the true motivation was racial discrimination in violation of federal law.

373.     The purpose and effect of the conspiracy was part of the same effort by all Defendants to deprive Officer Savage of the substantive rights provided by the Fourteenth Amendment to the U.S. Constitution and by 42 U.S.C. § 1983 as alleged above.

374.     Accordingly, Defendants have violated Officer Savage's rights as protected by 42 U.S.C. § 1985.

375.     Defendants' practices caused Officer Savage harm, including severe emotional distress, medical bills, and lost wages and benefits.

## COUNT XII
## RACE DISCRIMINATION AND RETALIATION IN VIOLATION of 42 U.S.C. §§ 1981 & 1983
### (Hostile Work Environment)
### (Savage v. Pocomoke City, County Commissioners of Worcester County, Blake, Crofoot, Morrison, Passwaters, Phillips, Smack, Wells, and Donaldson)

376.     Plaintiffs allege and incorporate each of the factual allegations stated in paragraphs 1 through 245 above.

377.     42 U.S.C. § 1981 guarantees that all persons shall have the right to make and enforce contracts, including employment contracts free from all forms of discrimination on the basis of race and national origin.  Section 1981 also prohibits retaliation against individuals who make complaints about racial discrimination in the creation and/or enforcement of contracts, including contracts for terms and condition of employment.  The right to be free from racial discrimination in employment and from retaliation for assertion of one's civil rights were both clear and well-established rights, known to each of the Defendants in this action throughout the time period of the allegations of this Complaint.

378.     Officer Savage was employed by the Pocomoke City Police Department for a period of approximately four and one half years, from April 2011 to October 2015.

379.     Officer Savage was also a joint employee of the Pocomoke City Police Department, the Worcester County Sheriff's Office, the Maryland State Police, and the CET for more than two years, from April 2012 to June of 2014.

380.     By the acts and omissions described above, Defendants, acting under color of state law, have maintained a pattern and practice of race discrimination and retaliation creating a hostile work environment.  Defendants used racial epithets directed toward, or in the presence of, Officer Savage regularly.  The behavior by the above listed Defendants occurred when the Defendants were acting within the scope of their employment and used incidents and tools of their employment.

381.     Defendants' conduct was both severe and pervasive, especially given that the racial epithets were either spoken or condoned by Officer Savage's supervisors.  Moreover, the hostile work environment was caused by policy or custom of the CET, and/or by Defendants Donaldson and Passwaters, the final policy making officials of the CET.  Officer Savage had a good faith and reasonable basis to complain about race discrimination, constituting protected activity under 42 U.S.C. § 1981.

382.     Officer Savage brings this claim through the remedial mechanisms of 42 U.S.C. § 1983.

383.     Defendants' practices caused Officer Savage harm, including severe emotional distress, medical bills, and lost wages and benefits.

## COUNT XIII
## VIOLATION of the FAIR LABOR STANDARDS ACT
### (Savage and Green v. Pocomoke City, Blake, and Morrison)

384.     Officer Savage and Lieutenant Green allege and incorporate each of the factual allegations stated in paragraphs 1 through 245 above.

66

385.     Section 7(a)(1) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a)(1), provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

386.     Officer Savage and Lieutenant Green were "employees," and Defendants were their "employers" under FLSA § 3, 29 U.S.C. § 203.

387.     Officer Savage and Lieutenant Green were not paid overtime as detailed above.

388.     Officer Savage is not an exempt employee under Section 13(a)(1) of FLSA, 29 U.S.C. § 213(b).  As a "police officer," the exemption also does not apply to him per 29 C.F.R. § 541.3(b)(1).  Therefore, he was owed overtime pay of one and one-half times his regular pay for all hours worked above forty in one week.  FLSA § 7, 29 U.S.C. § 207(a)(1).

389.     Lieutenant Green is not an exempt employee under Section 13(a)(1) of FLSA, 29 U.S.C.§ 213(b).  As a "police officer," the exemption also does not apply to him per 29 C.F.R. § 541.3(b)(1).  Therefore, he was owed overtime pay of one and one-half times his regular pay for all hours worked above forty in one week.  FLSA § 7, 29 U.S.C. § 207(a)(1).

390.     Since at least June 2014, Pocomoke City has known that it owed this money to Plaintiffs.

391.     Defendants violated the FLSA by knowingly, willfully, and intentionally failing to compensate Plaintiffs, and all other similarly situated individuals, the rate of time-and-one-half their regular hourly rate for every hour worked in excess of forty hours in any one workweek.

392.     Therefore, Pocomoke City owes Officer Savage and Lieutenant Green back

overtime wages, the same amount in addition as liquidated damages, and interest (both pre- and post-judgment) on the combined wages and liquidated damages.  FLSA § 16, 29 U.S.C. § 216 and 28 U.S.C. § 1961.

## **PRAYER FOR RELIEF**

Wherefore Officer Savage, Chief Sewell, and Lieutenant Green respectfully request that the Court:

1.      Enter judgment on their behalf against Defendants on all counts;

2.      Declare, pursuant to 28 U.S.C. § 2201, that through their acts and omissions, Defendants maintained a racially hostile work environment in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and a hostile work environment based on race discrimination and retaliation in violation of Title VII;

3.      Declare, pursuant to 28 U.S.C. § 2201, that through their acts and omissions, Defendants unlawfully terminated Plaintiffs based upon their race in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and based upon their race and in retaliation for their protected activity in violation of Title VII;

4.      Declare, pursuant to 28 U.S.C. § 2201, that through their acts and omissions, Defendants denied Plaintiffs equal wages and benefits based upon their race, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and based upon their race and in retaliation for their protected activity in violation of Title VII;

5.      Declare, pursuant to 28 U.S.C. § 2201, that Defendants improperly retaliated against Plaintiffs based upon their exercise of their rights to free speech and to petition the government for redress of grievances, in violation of the First Amendment of the United States Constitution;

6.     Declare, pursuant to 28 U.S.C. § 2201, that Defendants engaged in a civil conspiracy against Plaintiffs for exercise of their civil rights in violation of 42 U.S.C. § 1985;

7.     Declare, pursuant to 28 U.S.C. § 2201, that Defendants improperly interfered with Plaintiffs' employment relationship in retaliation for Plaintiffs' protected activity in violation of Title VII;

8.     Declare, pursuant to 28 U.S.C. § 2201, that by denying Plaintiffs overtime pay, Defendants knowingly, willingly, and intentionally violated the Fair Labor Standards Act, 29 U.S.C. § 207;

9.     Issue a permanent injunction that (i) prohibits Defendants, their officers, agents, employees, and successors from engaging in the discriminatory employment practices complained of herein; (ii) returns Plaintiffs to the employment positions they would have held but for Defendants' wrongful conduct; and (iii) imposes a prohibition of similar conduct in the future;

10.     Require three-year monitoring of all law enforcement activity by all Defendants to prevent any further racial discrimination and retaliation in employment, including the hiring, training, and promotion of new and current officers;

11.     Award Plaintiffs front pay and back pay with interest and other job benefits, including the value of health benefits, sufficient to redress all of the economic harms that they have suffered;

12.     Award liquidated damages in an equal amount to unpaid overtime pay pursuant to 29 U.S.C. § 216;

13.     Award Plaintiffs compensatory damages in an amount to be proven at trial sufficient to redress the harms that they have suffered, including physical and emotional distress, humiliation, embarrassment, loss of income, loss of overtime pay, and mental anguish;

14.     Award Plaintiffs appropriate punitive damages, against Defendants in their individual capacities, in an amount to be proven at trial that would punish Defendants for their knowing, intentional, willful, and reckless disregard of clearly established federal constitutional and statutory rights as alleged herein and enter any and all injunctive decrees and relief necessary to effectively prevent all Defendants from engaging in similar unlawful racial discrimination in the future;

15.     Award Plaintiffs reasonable attorneys' fees under 42 U.S.C §§ 1988, 2000e-5(k) and 29 U.S.C. § 216 and all taxable costs of this action;

16.     Award such other and further relief in any form that this Court deems just and proper under the facts and circumstances as proved at trial.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial on all issues triable by a jury.

Dated:  September 29, 2016

Respectfully Submitted,

/s/ Andrew McBride
Andrew McBride (D. Md. Bar No. 27858)
Christen B'anca Glenn (D. Md. Bar No. 14945)
Dwayne Sam (D. Md. Bar No. 29947)
Craig Smith (D. Md. Bar No. 17938)
Craig Fansler (D. Md. Bar No. 19442)
Brian Walsh (*pro hac vice*)
Jillian Laughna (*pro hac vice*)
**WILEY REIN LLP**
1776 K Street, N.W.
Washington, DC 20006
TEL: 202.719.7000
FAX: 202.719.7049
EMAIL: amcbride@wileyrein.com


Dennis A. Corkery (D. Md. Bar No. 19076)
Matthew Handley (D. Md. Bar No. 18636)
**WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS**
11 Dupont Circle, N.W.
Suite 400
Washington, DC 20036
TEL: 202.319.1000
FAX: 202.319.1010
EMAIL: Dennis_Corkery@washlaw.org


Deborah A. Jeon (D. Md. Bar No. 06905)
Sonia Kumar (D. Md. Bar No. 07196)
**ACLU of Maryland**
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211
TEL: 410.889.8555
FAX: 410.366.7838
EMAIL: jeon@aclu-md.org


*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Second Amended Complaint was served on all

defendants through their counsel via the CM/ECF system:

Ronald M. Levitan
Genevieve G. Marshall
Assistant Attorneys General, Maryland Department of State of Police
1201 Reisterstown Road
Pikesville, MD 21208
genevieve.marshall@maryland.gov
    *Counsel for the State of Maryland, Brooks Phillips, and Patricia Donaldson*

Daniel Karp
Karpinski, Colaresi & Karp
120 E. Baltimore Street, Suite 1850
Baltimore, MD 21202
brunokarp@bkcklaw.com
    *Counsel for Pocomoke City, Bruce Morrison, Russell Blake, and Ernie Crofoot*

Jason L. Levine
Assistant Attorney General, Maryland State Treasurer's Office
80 Calvert Street, 4th Floor
Annapolis, MD 21401
jlevine@treasurer.state.md.us
    *Counsel for Reggie Mason, Nathaniel Passwaters, Dale Smack, and Rodney Wells*

        /s/ Andrew McBride
        Andrew McBride (D. Md. Bar No. 27858)
        **WILEY REIN LLP**
        1776 K Street, N.W.
        Washington, DC 20006
        TEL: 202.719.7000
        FAX: 202.719.7049
        EMAIL: amcbride@wileyrein.com

        *Counsel for Plaintiffs*